# MORGAN'S LOUISIANA AND TEXAS RAILROAD AND STEAMSHIP COMPANY *v.* TEXAS CENTRAL RAILWAY COMPANY; FARMERS' LOAN AND TRUST COMPANY; AND METROPOLITAN TRUST COMPANY.

# TEXAS CENTRAL RAILWAY COMPANY *v.* MORGAN'S LOUISIANA AND TEXAS RAILROAD AND STEAMSHIP COMPANY; FARMERS' LOAN AND TRUST COMPANY; AND METROPOLITAN TRUST COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS.

Nos. 55, 59. Argued November 4, 1890. — Decided November 24, 1890.

When a mortgage provides that the principal shall become due for the purposes of foreclosure upon a default in interest continuing for sixty days, the trustees in the mortgage may proceed for the collection of the whole amount of principal and interest by bill in equity, without a formal declaration of the maturity of such principal.

If a mortgage contains a power of sale by advertisement at public auction for cash upon the request of the holder or holders of seventy-five per cent in the amount of the bonds secured thereby, that remedy is cumulative, and the restriction does not operate upon the right to foreclose by bill in equity, especially when in a separate clause it is provided that nothing in the mortgage contained shall be held or construed to prevent or interfere with the foreclosure of the instrument by any court of competent jurisdiction.

The mere fact that money loaned to a railroad corporation was expended in payment of interest on its first mortgage bonds or of operating expenses, does not entitle the lender to preference over the first mortgage bonds by way of subrogation, or on the ground of superior equities.

Although advances may have enabled a railroad company to maintain itself as a going concern, that fact alone does not give such advances priority over first mortgage bonds upon the theory that the interests of the public and of the bondholders were subserved by such advances.

A bill filed by a defendant, on leave, in order to a complete decree upon the whole matter in dispute, is properly styled a cross-bill; and where on the bill of the original complainant possession of property has been taken by a Circuit Court of the United States, the jurisdiction of the court in passing upon such a cross-bill in the disposition of the property does not depend upon the citizenship of the parties.

MORGAN'S Louisiana and Texas Railroad and Steamship Company, a corporation organized under the laws of the State of Louisiana, filed its bill on April 2, 1885, in the Circuit Court of the United States for the Northern District of Texas, against the Texas Central Railway Company, averring that the latter company was originally organized and incorporated under the general laws of Texas, on May 31, 1879, to build and operate a railroad from Ross Station, in McLennan County, to the centre of Eastland County: That on or about May 12, 1881, its charter was amended so as to authorize it to extend its railway from the latter point to a point on the north boundary line of the State, and to construct branch railways: That the company had built and owned about two hundred and twenty-eight miles of road, namely, from Ross to Albany, and from Garrett to Roberts, and was also the owner of certain town lots, and of equipment as described: That on or about the 15th of September, 1879, said Texas Company executed to the Farmers' Loan and Trust Company of New York, as trustee, a mortgage to secure the payment of a series of bonds of one

thousand dollars each, covering its railroad, built and to be built, from Ross to the centre of Eastland County, payable thirty years after November 1, 1879, with interest payable semi-annually, and bonds to the amount of $2,145,000 had been issued and were outstanding: That on May 16, 1881, the Texas Company executed to the same Trust Company, as trustee, a mortgage to secure the payment of another series of bonds of one thousand dollars each, covering its entire main line of railroad, built and to be built, and also its branch lines as described, payable in thirty years, with interest semi-annually, and bonds to the amount of $1,254,000 had been issued and were outstanding under this mortgage: That on October 1, 1884, the Texas Company executed to the Metropolitan Trust Company of New York, as trustee, a mortgage of all its railway and railway lines, whether constructed or to be constructed, to secure an issue of bonds to be known as "general-mortgage bonds" of said railway company, which bonds had been signed and sealed, but not certified by the trustee, because of delay in recording the trust deed in all the counties of the State into which the road had been actually built: That the Texas Company, finding itself in great financial embarrassment, and requiring pecuniary assistance, and being already indebted to the Houston and Texas Central Railway Company in a very large amount, obtained further advances from the latter company, making, "with amounts theretofore loaned to it" by the Houston Company, a total indebtedness from the Texas Company to the Houston Company of $761,-992.04: That for the security of "said advances then and theretofore made by said Houston and Texas Central Railway Company to said Texas Central Railway Company," the Texas Company, on the first of November, 1884, made and executed its sixteen certain promissory notes, fifteen thereof for the sum of $50,000 each, and one thereof for the sum of $11,992.04, and for the security of said sixteen notes the Texas Company pledged to the Houston Company all the "general-mortgage bonds" which it was authorized to issue for the length of road already built by it: That all of the notes were dated November 1, 1884, and all due on demand, but the Texas

Company, though requested, had refused and failed to pay the same: That in order to make the pledge of the bonds, which were not yet countersigned and certified by the trustee, the Texas Company issued and delivered to the Houston Company its certificates, obligating itself to deliver the bonds as soon as executed and signed by the trustee: That the Houston Company pledged said notes and certificates to complainant, as part security for an indebtedness exceeding one million of dollars due by the Houston Company to complainant, and complainant is now the holder, as pledgee, of all of the notes and certificates: That the deed of trust, with the certificates, constituted a full, complete and perfect equitable mortgage and lien upon the railway and the property therein described: That the advances by the Houston Company to the Texas Company were made at various times for taxes, fuel, supplies, labor, repairs, operating and managing expenses, proper equipment, useful improvements and other necessary expenditures, by which the Texas Company's railway had been kept in running order, and its business and improvements increased, and thereby rendered more beneficial to the bondholders and to all other creditors of the Texas Company: That the indebtedness was contracted by the defendant upon the consideration of its promise to pay the same out of the earnings of its railway, and the same was and is, in equity and good conscience, a first lien upon the income and property of said railway, but the defendant instead of paying the debt out of the earnings of said railway, had failed to pay any part of it, and had used a large amount, at least $500,000, of said earnings, during the years 1882, 1883 and 1884, for the payment of coupons upon its first mortgage bonds, although the holders · of such coupons were only entitled to receive payment thereof after the defendant had paid the complainant the amounts advanced and expended in the manner and for the purposes in the bill set forth: That unless the relief sought was obtained, the certificates which complainant held, and the bonds when issued, would be greatly depreciated in value, and any effort to foreclose complainant's pledge would result in imposing a debt of $2,286,000 upon said defendant without any

adequate relief to complainant, and defendant had no property upon which to levy an execution save and except the properties mortgaged, and the sale of the property would be ineffectual by reason of the uncertainty as to the rights which would be acquired by the purchaser; that the Texas Company was in embarrassed circumstances, the pay-rolls for January and February, 1885, were unpaid and those for March would not be paid, and the company would default upon the interest of its bonds due May 1; that it had no money in its treasury and no credit upon which to raise it; that it had no supplies; that many suits were pending against it which would ripen into judgments for large amounts of money; that the receipts had been growing less and there was no hope of their increase in the immediate future; that the road ran through a new and undeveloped country in which great financial depression existed at the then present time, "and that unless said railway be administered in such a manner as to maintain it with unimpaired efficiency during this period of depression, its assets will be sacrificed without any adequate benefit to any of its creditors;" that the financial embarrassments of the Texas Company were aggravated by the fact that it was originally built as relying on business connections with the Houston Company; that it had always been managed and operated in connection with the latter; that it had no round-houses or repair shops, and its maintenance and transportation business had always, until recently, been conducted entirely by the officers of the operating department of the Houston Company without any additional expense to the Texas Company, but that the Houston Company had lately been placed in the hands of receivers by the order of the United States Circuit Court for the Fifth Judicial Circuit and Eastern District of Texas in a suit entitled "*The Southern Development Company* v. *The Houston and Texas Central Railway Company*," and the result of said receivership had been to deprive the Texas Company of its former operating officers and of the benefit of the harmonious business relations formerly existing with the Houston Company, and the interdependence of said two railways upon each other had been such that it was to the vital

interests of both companies that that interdependence should be maintained; that the Houston Company owned over one-third of the capital stock of the Texas Company, and the Houston Company was also obligated for the indebtedness of $761,992.04, pledged by it to complainant, and it was of vital importance to both of said roads that the management of the two should be under one common head. Complainant prayed for the appointment of one or more receivers of the property of the defendant and for a decree for the payment and satisfaction of its claims out of the rents, revenues, issues and profits coming to the receivers. Copies of the deeds of trust from the Texas Central Railway Company to the Farmers' Loan and Trust Company of September 15, 1879, and of May 16, 1881, and of that to the Metropolitan Trust Company of October 1, 1884, were attached to the bill.

On the 4th of April, 1885, the receivers of the Houston Company were appointed receivers of the Texas Company, the Texas Company appearing and submitting the motion for such action of the court as might seem just and equitable. On the 2d of May complainant filed its amended and supplemental bill against the Farmers' Loan and Trust Company, trustee, and the Metropolitan Trust Company, trustee, as well as the Texas Central Railway Company, which recapitulated the averments of the original bill and insisted that the indebtedness of $762,000 was an equitable lien upon all the property of the railway company, and entitled to be paid, in case of sale, out of the proceeds of such sale, before any money was paid to the holders of the said mortgage bonds: That the indebtedness should have been paid by the railway company out of its annual earnings, which were sufficient for that purpose, but instead of paying the debts incurred for labor, material, betterments and services necessary to the operation of the railway, and to keep the same in proper condition of repair and running order, the defendant railway company expended its revenues in paying the interest on the mortgage bonds, leaving the complainant and others similarly situated unpaid, and they were entitled, in equity and good conscience, to stand in the place and stead of said mortgage creditors for the amounts the

latter had respectively received, and to have their claims satisfied out of the property of the railway company, or out of the proceeds of any sale thereof. The bill prayed, among other things, for a decree of lien by reason of the certificates, an accounting, a sale of the property if necessary, and the payment of the amounts decreed to be due the complainant, out of the proceeds, in preference to any amounts due on the mortgage bonds, etc.

The Texas Company answered, admitting in general the allegations of the bill, but submitting to the court that the bill was destitute of equity.

The Metropolitan Trust Company filed its answer August 17, 1885, admitting the allegations in respect to the mortgage executed to it as trustee on October 1, 1884, and that it refused to certify bonds thereunder until the completion of the recording of the mortgage. The Farmers' Loan and Trust Company answered September 24, 1885, and denied, on information and belief, the allegations of the bill in respect to the advances by the Houston Company to the Texas Company, and also that the indebtedness stated in the bill was a first lien upon the income or property of the Texas Company, and averred that, if any advances were made, they were payments which, in equity, should be imputed to complainant; that the Houston Company and the complainant were the owners of the Texas Company and of its property, holding the same as a mere appendage to the Houston road, and the mortgages executed by the Texas Company were in fact mortgages procured to be made by the parties controlling the complainant and the Houston Company; and, in various averments, recited the facts and circumstances attending the formation of the Morgan Company, its ownership of the Houston Company, and the creation of the Texas Company, and of the Southern Development Company, upon whose application receivers had been appointed for the Houston Company in the suit referred to in complainant's bill; it alleged that the complainant in that suit and in this, represented practically and substantially the same interests, the two complainant corporations being owned and controlled by the same persons, and that all the

proceedings and acts of the defendant, the Texas Company, from its organization were, in fact and law, those of the complainant, and to be equitably imputed to the complainant: and it denied that the Texas Company had used its earnings for making payment of coupons upon its first mortgage bonds, and which the holders were not entitled to receive, and asserted that the bill, as framed, was open to demurrer, for reasons given.

Subsequently, the Farmers' Loan and Trust Company, upon leave duly granted, filed its cross-bill in the cause against complainant and its co-defendants. This set up the mortgages and averred that the mortgagor had failed to pay the interest on all the bonds secured by the mortgages respectively, which became due and payable May 1, 1885, and all interest since that date; that payment of such interest had been duly demanded; that said default had continued sixty days after such demand, and thereupon the principal of all the bonds was and had become immediately due and payable; that the lien of the deed of trust to the Metropolitan Company was subsequent and subsidiary to the lien of the trust deeds or mortgages made to complainant; and that, if the claim of the Morgan Company, as set forth in its bill, was a lien at all on the property, it was subject and inferior to the liens of the mortgages to complainant. The bill alleged the insolvency of the Texas Company, and the insufficiency of its net earnings to pay the floating debt and discharge the interest on the mortgage bonds, and concluded with the usual prayers for the appointment of a receiver, an injunction and an account of the bonds and the amounts due the holders; and for a decree that the amounts so found due shall constitute a first lien on the property; that the railway company pay into court the amount found due, together with costs; and that, in default of such payment, the property and franchises of the railway company be sold; and for judgment for any deficiency. The fourteenth paragraph of this cross-bill averred that the Texas Company had made default upon the first deed of trust held by it, by failing to pay the interest on the bonds which became due and payable on the first day of May, 1885; that payment of such

interest had been duly demanded, "and said default had continued sixty days after such demand;" and that "thereupon the principal of the said bonds secured by said last-mentioned mortgage or deed of trust is and has become immediately due and payable, and the same and all said interest so in arrears as aforesaid remains still due and unpaid." Paragraph fifteen made the same averments as to the second mortgage held by the cross complainant.

The Texas Company, in its answer, admitted the allegations of the bill of the Farmers' Loan and Trust Company as to the execution of the mortgages, and admitted the fourteenth paragraph of the bill to be true, except that it set up, by way of explanation, that its roads and property were placed in the hands of receivers on May 14, 1885, on the bill filed by the Morgan Company. It admitted the allegation in the fifteenth paragraph to be true, as stated.

The Morgan Company, in its answer, reiterated all the averments in its original and amended bills, and claimed that it had a lien upon the property of the Texas Company, and that, in any foreclosure proceedings, it was entitled to be paid out of the proceeds of sale by preference over the mortgage creditors. It admitted that the matters set forth in the fourteenth and fifteenth paragraphs of the cross-bill were true.

The Metropolitan Company admitted the allegations of the cross-bill respecting the mortgage executed to it, as trustee, by the railway company, in October, 1884, and alleged that no bonds had, to its knowledge or belief, been issued secured by the lien of the said mortgage.

Replications were filed and proofs were taken.

Evidence was given of the issuing of the bonds under the two mortgages to the Farmers' Loan and Trust Company, and of a request to that company for the institution of proceedings to foreclose the trust deeds, but not on behalf of the holders of seve..ty-five per cent. of the bonds of either issue. The three trust deeds or mortgages referred to in the original bill, the sixteen notes, amounting to $761,992.04, and the certificates of the Texas Company, were also put in evidence, and a statement from the books of the Texas Company, as follows:

## "TEXAS CENTRAL RAILWAY COMPANY.

*" Statement of Gross Earnings, Expenses of Operation, and Charges against Income from Commencement of Operation to Sept. 30, 1884, Inclusive.*

| | Gross earnings. | Operating expenses. | Taxes. | Interest on bonded debt. | Total charge against income. | Deficit. |
|---|---|---|---|---|---|---|
| To Dec. 31, 1880. | $102,773 76 | $75,360 25 | $79 67 | $54,250 00 | $129,689 92 | $26,916 16 |
| " " " 1881. | 247,707 02 | 115,426 83 | 3,603 24 | 140,875 00 | 259,905 07 | 12,198 05 |
| " " " 1882. | 205,887 32 | 157,896 73 | 9,626 79 | 218,680 00 | 386,203 52 | 180,316 20 |
| " " " 1883. | 290,262 45 | 248,310 73 | 13,440 32 | 237,930 00 | 499,681 05 | 209,418 60 |
| " Sept. 30, 1884. | 210,312 78 | 177,302 88 | 14,337 40 | 237,930 00 | 429,570 28 | 219,257 50 |
| Total . . . . . | $1,056,943 33 | $774,297 42 | $41,087 42 | $889,665 00 | $1,705,049 84 | $648,106 51 |
| Interest other than on bonded debt . . . . . . . . . . . . . . . . . . . . | | | | | | 70,098 85 |
| Total deficit . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | | $718,205 36 |
| | | | | | | 70,098 85 |
| | | | | | | $648,106 51 " |

The Morgan Company called as a witness, E. W. Cave, treasurer for the receivers, and treasurer for the Texas Company in 1880, 1881, 1882, 1883, and 1884, and also of the Houston Company, and produced the resolution of the directors of the Houston Company of December 1, 1884, pledging the notes and certificates to the Morgan Company and the receipt of the latter therefor. Mr. Cave testified that the notes were given by the Texas Company to the Houston Company in settlement of the indebtedness of the former to the latter, which arose from cash advances and payments made by the Houston Company for the benefit of the Texas Company; that the account between the Houston Company and the Texas Company was adjusted and closed about the last of October, 1884; that there was no year during the five years mentioned when the Texas Company earned enough to pay its operating expenses and fixed charges, including taxes; that the funds advanced were used in paying the operating expenses of the Texas Company for material and supplies, for maintenance and such things as had to be done to improve or keep the property up, and some portion of it may have been applied to the maintenance of its security by the payment of interest on its bonds; that some of the money necessarily went for that, because whatever money was used by the

company out of its own gross earnings from its general business, for the payment of interest, left a deficit in its operating expenses and maintenance, which had to be covered by advances; that the officers of the Houston Company and of the Texas Company were practically the same; that no salary was paid to the officers of the Texas Company, which was organized in the interest of the Houston Company; that the Houston Company owned about two-fifths of the Texas Company's stock and the Morgan Company the other three-fifths; that the directors of the two companies were mainly the same, and the Morgan Company owned a majority of the stock of the Houston Company; that the bonds that were issued under the mortgage to the Farmers' Loan and Trust Company were negotiated by the president of the Houston Company; that the Texas Company was practically a part of the Houston Company, and the latter company collected its revenues and accounts; that the money was disbursed from the moneys that were collected, and only as the deficit arose and increased were the advances made by the Houston Company; that the road was operated practically as a division of the Houston Company; that the officers of the Houston Company acted as officers of the Texas Company; that the revenues came in and went into accounts, and then those accounts went on to the books of the Texas Company where matters were not kept direct; that the earnings went into the books of the Houston Company, and, when the Texas Company got into debt, the executive officers of the Houston Company advanced the money; that they were authorized to advance it and the debts of the Texas Company were paid; that the Houston Company collected all the earnings of the Texas Company, and when the latter was short it received help; that that was the way this balance of nearly $762,000 arose, it being the balance of running account beginning from the time the road commenced to be operated as a road; that, when the settlement was made upon which these notes were issued, the account was brought down to date, interest calculated by the auditor of the Houston Company, understood and acknowledged, and a balance of interest struck, and the balance found to be as stated, about

$762,000; that interest was computed on both sides; that there was a continual running account; that, when the Texas Company had funds and balances, it paid the interest on the bonds, and did not have to call on the Houston Company for funds, and whenever it did not have funds, as in the matter of interest or as in other matters, whatever balance was needed was supplied, but the Texas Company's coupons were paid by Cisco & Son upon separate account, that firm being the fiscal agent of both roads.

The following were questions to and answers of the witness:

" Q. The accruing funds, the income of the Central Company, was there any special use of its own funds, of its own earnings, towards paying running expenses rather than interest, or towards paying interest rather than running expenses, or was that all a matter of running account?

" A. It was all in one account, so far as the account of the Houston and Texas Central Railway Company was concerned, and whether the advances were made for one purpose or another they were charged so much cash; but the Texas Central Railway Company, of course, took cognizance of what it was used for.

" Q. So that whenever it was behindhand on its current indebtedness and needed money the Houston and Texas Central Railway Company paid it, and when it came to pay interest and did not have funds, the Houston and Texas Central Railway Company paid it?

" A. The Houston and Texas Central Railway Company let it have the money."

On the 12th of April, 1887, the Circuit Court entered its decree. The decree found the execution and delivery to the Farmers' Loan and Trust Company of the two mortgages of September 15, 1879, and May 16, 1881, and of the mortgage of the first day of October, 1884, to the Metropolitan Trust Company: That the liens and claims of the Metropolitan Company and the beneficiaries under its trust were in all respects subsequent, subsidiary and junior to the rights and equities of the Farmers' Company and its beneficiaries, both

of the mortgages to the Farmers' Company being prior liens to the mortgage to the Metropolitan Company, the first as to the property therein described, and the second as to the entire property of the defendant, the Texas Company : That the Morgan Company had an equitable lien upon all the property of the Texas Company to the amount of $761,992.04, with interest from November 1, 1884, said lien, however, being junior and subordinate in all respects to the liens under the mortgage deeds of trust to the Farmers' Company : That in each of the mortgages it was provided that in case the Texas Company, defendant, should fail to pay any of the interest on any of the bonds due under the mortgage at any time when the same might become due and payable, and said default should continue sixty days after said demand, then and thereupon the principal of all of the said bonds should become immediately due and payable ; that the Texas Company was on May 1, 1885, and still was, insolvent and unable to meet or pay its obligations, including the coupons issued on its bonds secured by the said mortgages to the Farmers' Company and maturing upon that date, and that it wholly failed to pay the same, and made default in the payment of all the coupons upon said bonds, and has not paid any of the said coupons which fell due November 1, 1885, or May 1, 1886, nor any coupons which matured since that date ; that payment of said interest has been duly demanded and said default has continued sixty days after such demand ; and that the principal of all the bonds under both mortgages was and had become immediately due and payable. It found the amount of principal and interest due on both sets of bonds, and that by reason of the default of the Texas Company to pay the interest and any of it, and by reason of other matters and things hereinabove alleged, the conditions of the mortgages and of each of them held by the Farmers' Company had been broken, and the said mortgages and deeds of trust and both of them, had become absolute, and the trustee was entitled to a decree for the sale of all the mortgaged property to satisfy the principal and interest of the said bonds ; and the decree then ordered, adjudged and decreed that the principal sums had

become due and payable, and that unless the defendant, the Texas Company, should within ten days pay into court the sum found due with interest, and an amount sufficient to defray the costs, the equity of redemption of said defendant, and of all the parties to the suit, and of all the holders of bonds or other claims secured by the mortgage to the Metropolitan Company, in or to the mortgaged property, should be barred and foreclosed, and the mortgaged premises and property should be sold to the highest bidder for cash, as provided. It further ordered, among other things, that in case the amount of the bid should be more than sufficient to pay the sums and amounts found and adjudged to the Farmers' Company, the overplus should be applied to the payment of the sums decreed to be due to the Morgan Company; and provided for deficiency decrees in favor of the Farmers' Company and the Morgan Company.

From this decree separate appeals were prosecuted by the Morgan Company and the Texas Company. On behalf of the Morgan Company it was insisted, that the court erred in adjudging that its claim was not in equity a lien and charge upon the property of the Texas Company, prior and superior in right to the lien of the mortgages of the Farmers' Company, and justly entitled to be paid out of the proceeds of the sale of the property in preference to the mortgage bonds; and in granting leave to the Farmers' Company to file the bill of complaint for the foreclosure of the mortgages, and rendering a decree thereon; and that, if it had jurisdiction to entertain the bill of the Farmers' Company, then it erred in proceeding to a decree for foreclosure and sale to pay the principal of the bonds upon a default in the payment of interest, without averring and proving that the bill had been filed for that purpose by the request of the holders of seventy-five per cent in amount of the outstanding bonds.

On behalf of the Texas Company errors were assigned to the action of the court in entertaining the bill of the Farmers' Company and rendering the decree of foreclosure and sale thereon; and also in adjudging the principal sums of the bonds to be due and payable, and in decreeing foreclosure and sale

without proof of a request to the trustee, by the holders of seventy-five per cent, in amount, of the bonds, to foreclose.

*Mr. J. Hubley Ashton* for Morgan's Louisiana and Texas Railroad and Steamship Company, appellant.

I. *The Priority of the lien of the appellant.*

The first three assignments of error upon the decree below, present the question as to whether or not the claim of the Morgan Company, the original complainant, constitutes, in equity, a lien and charge upon the property of the defendant Railway Company, prior and superior in right to the lien of the mortgages to the defendant, the Farmers' Loan and Trust Company, and is justly entitled to be paid out of the proceeds of the sale of that property in preference to the mortgage bonds.

. It is maintained and submitted, on the part of the appellant, that this question should be answered in the affirmative upon the principles settled in this court by the case of *Fosdick* v. *Schall*, and the decisions which followed it, on the subject of the relative equitable rights of mortgage and other creditors of an insolvent railroad company, in respect to its property in the hands of a court of equity, for administration as a trust fund for the payment of incumbrances; and that, upon the authority of those adjudications, the appellant is entitled to the relief asked in respect to the advances which constitute the basis of its claim in this suit. *Fosdick* v. *Schall*, 99 U. S. 235; *Hale* v. *Frost*, 99 U. S. 389, 392; *Miltenberger* v. *Logansport Railway Co.*, 106 U. S. 286, 311; *Union Trust Co.* v. *Souther*, 107 U. S. 591, 594; *Union Trust Co.* v. *Walker*, 107 U. S. 596; *Burnham* v. *Bowen*, 111 U. S. 776; *Union Trust Co.* v. *Illinois Midland Co.*, 117 U. S. 434, 457; *Porter* v. *Pittsburgh Bessemer Steel Co.*, 120 U. S. 649; *Penn* v. *Calhoun*, 121 U. S. 251; *Sage* v. *Memphis &c. Railroad Co.*, 125 U. S. 361; *St. Louis &c. Railroad Co.* v. *Cleveland &c. Railway*, 125 U. S. 658, 676; *Union Trust Co.* v. *Morrison*, 125 U. S. 591, 609, 612; *Toledo &c. Railroad Co.* v. *Hamilton*, 134 U. S. 296, 302. See, also, *Blair* v. *St. Louis &c. Railroad Co.*,

22 Fed. Rep. 474; *Farmers' Loan and Trust Co.* v. *Vicksburgh &c. Railroad Co.*, 33 Fed. Rep. 778.

The decisions thus cited are so recent, and the doctrines declared so familiar to the court, that it is unnecessary to present a detailed analysis of them.

It would seem to be plainly deducible from them, that where a mortgaged railroad is in the hands of a court of chancery, in foreclosure proceedings, and it appears that advances were made to the company to enable it to pay the expenses of maintenance and operation, in lieu of moneys diverted from the earnings to pay bonded interest, or to enable it to pay such interest when there were no net earnings applicable to it, or when the net earnings were insufficient to meet the bonded interest, the mortgage security is chargeable with the payment of the debt for such advances in preference to the mortgage bonds.

Under such circumstances there should be a restatement of the account, and there must be charged against that which would otherwise go to the bondholders, such amounts as they have received, which ought really to have been applied to the cost of maintaining and operating the road, or which were in excess of the amounts that upon a correct accounting they were entitled to receive in respect to the operations of the road.

Such advances constitute a debt of the mortgaged property, and are equitably entitled to be paid out of the proceeds of its sale in preference to any payment upon the mortgage bonds.

The principles thus adjudged by this court entitle the appellant to the payment of its claim in respect to the advances to the Texas Central Railway Company set forth in the bill, and shown by the proofs, in this cause, and decreed by the court below to be due to the appellant, out of the proceeds of the sale of the mortgaged property, before the mortgage bonds, and in preference to payment upon those bonds.

The aggregate amount of those advances, as shown by the testimony of Mr. Cave, and the statement annexed to his deposition, was $648,106.51, which, with interest thereon to November 1, 1884, amount to the sum of $761,992.04, repre-

sented by the sixteen notes delivered by the Texas Central Railway Company to the Houston and Texas Central Railway Company, and endorsed and pledged by the latter Company as part security for its indebtedness to the appellant, as stated in the testimony of Mr. Cave.

It is unimportant, in any view of the rights of the appellant, involved in this cause, that, as stated by Mr. Cave, the Houston and Texas Central Railway Company owned about two-fifths of the capital stock of the Texas Central Railway Company, and that one-fifth of that stock was owned by Morgan's Louisiana and Texas Railroad and Steamship Company.

It has been often said, by this court, that the stockholders are not the corporation, which is a separate, legal or political person, distinct from the stockholders, whose property and rights of contract, or otherwise, belong to "the legal entity, the artificial being, created by the charter," and not to the individual members. *Bank of Augusta* v. *Earle*, 13 Pet. 519, 587; *Pullman Car Co.* v. *Missouri Pacific Co.*, 115 U. S. 587; *Porter* v. *Bessemer Steel Co.*, 120 U. S. 649, 670.

II. *The Bill of the Farmers' Loan and Trust Company.*

The replications of Morgan's Company to the answers of the Farmers' Loan and Trust Company, and the Metropolitan Trust Company, were filed November 2, 1885, and the cause was thus at issue at that time.

The application of the defendant, the Farmers' Loan and Trust Company, whose answer was filed September 24, 1885, for leave to file a cross-bill for the enforcement and foreclosure of its mortgages, was not filed until July 3, 1886; and on July 1, 1886, it appears, the District Judge granted the Company leave to file the bill exhibited by it, as a cross-bill in the original suit.

The bill appears to have been filed July 3, 1886.

The rule of equity procedure is well settled that the proper time for filing a cross-bill, where such a bill is necessary, is at the time of putting in the answer to the original suit, and before the issue is joined by the filing of the replication. 2 Daniell's Ch. Pr., 1650.

The answer was, in fact, both an answer and a demurrer to

the bill of the Morgan Company.   It was not necessary to the defence of the Farmers' Company to the claim asserted in the bill, or to a complete determination of its merits, that this foreclosure bill should be filed.

As an original bill the court below had no jurisdiction to entertain it, since the complainant (the Farmers' Loan and Trust Company) and one of the defendants, (the Metropolitan Trust Company of New York,) are citizens of the same State.

Section 738 of the Revised Statutes providing for substituted service, by publication, against non-resident defendants, "in a suit in equity to enforce any *legal or equitable lien or claim* against real or personal property in the District where the suit is brought," does not give, or purport to give, jurisdiction to the Circuit Court, in such a suit, where the complainant and one of the defendants are citizens of the same State. *Brigham* v. *Luddington,* 12 Blatchford, 237, 241; *Carpenter* v. *Talbot,* 33 Fed. Rep. 537.

As the bill for foreclosure of the Farmers' Loan and Trust Company sought to extinguish the equity of redemption of the Metropolitan Trust Company of the City of New York, as junior mortgagee, that Company was a necessary and indispensable party to the bill, or any bill for the foreclosure of the mortgages to the Farmers' Loan and Trust Company, seeking to divest its rights in the mortgaged estate.   *Chicago and Vincennes Railroad* v. *Fosdick,* 106 U. S. 47.

Unless, therefore, the Farmers' Loan and Trust Company was entitled to file this bill, as a proper cross-bill, in the original suit, according to the principles applicable to such bills in the Federal Courts, the court below erred in granting leave to file the bill, and in entertaining the same, and should have dismissed the bill for want of jurisdiction to consider it.

It is submitted, on the part of the appellant, that the so-called cross-bill is not, and cannot stand, as a true or proper cross-bill in this suit, within the jurisdiction of the Circuit Court, by virtue of its jurisdiction of the original cause.

This court has adopted Judge Story's definition: "A cross-bill, *ex vi terminorum,* implies a bill brought by a defendant in a suit against the plaintiff, or against other defendants, in

the same suit, or against both, *touching the matters in question in the original bill.* Story Eq. Pl., sec. 389; Curtis, J., in *Shields* v. *Barrow,* 17 How. 130, 145. See also *Ayres* v. *Carver,* 17 How. 591; *Cross* v. *De Valle,* 1 Wall. 5, 14; *Rubber Co.* v. *Goodyear,* 9 Wall. 807, 809.

It cannot be said, we think, that within these adjudicated definitions the present bill is a true cross-bill, a mere auxiliary or ancillary suit, a graft or dependency on the original bill, which is supported by the jurisdiction of the Circuit Court over the original suit, rendering it unnecessary that it should appear that the bill could be maintained, in that court, as an original or independent suit for relief.

III. *The construction and effect of the mortgages.*

The contention, on the part of the appellant, is, that by the true construction of the foregoing conditions of the mortgages, the action of the trustee, in enforcing the stipulation that upon the prescribed default in the payment of the interest, the principal of the bonds shall become due, is subjected to the wishes of the bondholders, and the trustee is without right or power to institute proceedings for the collection of the principal sum of the mortgage debt, by foreclosure and sale, upon such default in the payment of the interest, before the day fixed by the credit, except upon the request of the holders of seventy-five per cent in amount of the bonds outstanding under the mortgages. By the true construction of the contract, the principal sum of the mortgage debt is not absolutely due, for the purpose of a foreclosure of the lien against the *corpus* of the property, by reason of default in the payment of coupon interest, until the holders of seventy-five per cent of the debt shall request the trustee to *foreclose* the mortgages.

In other words, the *right of action* for the principal debt, against the *corpus* of the mortgaged estate, does not *accrue* until the bondholders have requested the trustee to foreclose the mortgages.

*Mr. Charles H. Tweed* for the Texas Central Railway Company, appellant, submitted on his brief.

*Mr. Herbert B. Turner* for the Farmers' Loan and Trust Company, appellee.

MR. CHIEF JUSTICE FULLER, after stating the case as above reported, delivered the opinion of the court.

The objection that the Farmers' Company could not proceed to a foreclosure and sale to pay the principal as well as the interest of the bonds upon a default in the payment of interest, without averring and proving that the bill had been filed for that purpose by the request of the holders of seventy-five per cent in amount of the outstanding bonds, rests upon the language of the conditions of the mortgages. Each of them, after providing that it should be void in the event that the railway company should pay the principal of the bonds and the several instalments of interest as they became due, stipulated as follows:

" But in case the Texas Central Railway Company shall fail to pay the principal or any part thereof, or any of the interest on any of the said bonds at any time when the same may become due and payable according to the tenor thereof, and if the said default shall continue sixty days after having been demanded, then and thereupon the principal of all the said bonds hereby secured shall be and become immediately due and payable, and upon the request of the holder or holders of seventy-five per cent of said bonds then outstanding, and written notice of said request being served on the New York agency of the party of the first part, at which said bonds and coupons are made payable, the said trustee (who may act by its president or attorney), or its successor or successors in this trust, may and shall take actual possession (with or without entry or foreclosure) of said railway hereby conveyed, and of all and singular the said mortgaged property, and shall manage and operate the same and receive all the income and profits of the same, together with all the books, papers, records, accounts, and money of said railway company, first defraying out of the same the expenses of the road and its needful repairs and the management of said trust, and the surplus to pay the interest and principal of all the bonds issued hereunder which may be due and outstanding and hereby secured *pro rata;* and, upon the request of the holder or

holders of seventy-five per cent in amount of the bonds so in default which may be at any time outstanding under this deed of trust, it shall be the duty of the said Farmers' Loan and Trust Company of the city of New York, by its president or agent duly appointed in its behalf, to foreclose this mortgage or deed of trust and sell the property herein and hereby conveyed, at the city of Houston, Texas, at public auction, to the highest bidder for cash, after having given at least sixty days' notice of the time, place, and terms of sale by advertisement in at least two daily newspapers published in the city of Houston, and two daily newspapers published in the city of New York," etc.

It is contended on behalf of the appellants that by the true construction of the foregoing conditions, the action of the trustee in enforcing the stipulation that, upon the prescribed default in the payment of the interest, the principal of the bonds should become due, is so far subjected to the wishes of the bondholders, that the trustee is without right or power to institute proceedings for the collection of the principal sum before the date of payment in course, by foreclosure and sale upon such default on interest, except upon the request of the holders of seventy-five per cent in amount of the bonds outstanding. We do not agree with this view. Whenever default upon the interest should continue sixty days after maturity and demand, then and thereupon it was declared that the principal of all of the bonds should be and become immediately due and payable, and that the trustee, upon the request of the holder or holders of seventy-five per cent of the outstanding bonds, and written notice thereof being served on the New York agency of the mortgagor, where the bonds and coupons were made payable, might take possession and operate the road; and upon like request it was made the duty of the trustee to foreclose the mortgage and, after advertisement, sell the property at public action to the highest bidder for cash. Hence, although, as to the particular form of foreclosure and sale at public auction by advertisement, and without the aid of the court, the proper construction would be that that course could not be taken without the request prescribed, this not

only did not limit the power of the trustee to proceed by application to a court of equity to foreclose, but each of the mortgages contained near its close the following clause : " It is hereby further agreed that nothing herein contained shall be held or construed to prevent or interfere with the foreclosure of this instrument, the appointment of a receiver, or any other act or proceeding appropriate in such cases, by any court of competent jurisdiction."

There was nothing in the mortgages which took away the inherent right of resort to the courts, and this clause did not impart what existed without it, but its insertion, evidently out of abundant caution, made it perfectly clear that the provisions relied on by appellants did not apply to foreclosure by bill in equity but to the cumulative remedy specified. It is easy to see why taking possession and selling without the intervention of the court should be guarded against, and the trustee not be required or allowed to proceed in that summary manner except on the request of a certain percentage of the holders of the bonds. Such proceedings might result in injury, which could not be predicated of those regularly taken in a court of equity. Arbitrary procedure by the trustee was not deemed desirable, in view of the interests of both mortgagor and the bondholders as a class, while each would find the protection, to which it might be entitled, at the hands of the court. *Mercantile Trust Co.* v. *Missouri, Kansas & Texas Railway*, 36 Fed. Rep. 221.

The case of *Chicago and Vincennes Railroad* v. *Fosdick*, 106 U. S. 47, is so different upon the facts from that in hand as to deprive it of the weight attributed to it by appellants. The mortgage in controversy in that suit contained no provision saving to the trustees the right to resort to the courts for a foreclosure. It provided for a remedy in case of default, by entry and sale by the trustees, and also by foreclosure and sale, but it was provided that demand for possession should not be made by the trustees until they were required to take such possession by the holders of at least one-half of the outstanding bonds, and that where there was a default on interest, continued for six months after demand, the trustees might

declare the principal due and give notice to the mortgagor, and, upon the written request of the holders of a majority of such bonds, proceed to collect both principal and interest by foreclosure and sale, or otherwise, as provided. (106 U. S. 49, 50.) This court held, that the restriction on the acceleration of the principal did not prevent a foreclosure suit for overdue interest, and that, as the company in that case was in default on some of the coupons, the trustees or any bondholder, independently of the particular provisions just referred to, on non-payment of any instalment of interest, could file a bill for the enforcement of the security and obtain a decree *nisi*, for such defaulted interest, and if the same were not paid as directed, a sale would be ordered. But as the finding of the amount due was the foundation of the right of the mortgagee to proceed, and the right to redeem would not be taken away except upon a strict compliance with the steps necessary to divest it, it became, said Mr. Justice Matthews, speaking for the court, " of the first importance to ascertain whether the decree of foreclosure and sale, in the present case, found due and required to be paid, as the condition of exercising the right to redeem, a larger sum than was then due." The evidence being examined, it was found that there was none to establish that " any coupon, not afterwards funded, was presented and payment thereof refused; " and it was pointed out, that under the eighth article of the mortgage there involved, (which provided that if default was made in the payment of any half year's interest on any of said bonds, and the coupons for such interest should have been presented, and such default should have continued for six months after such demand, without the consent of the holder of said coupon or bond, then the principal of all of the said bonds should be and become immediately due and payable, anything in said bonds to the contrary notwithstanding, and that the trustees might so declare the same and notify the party of the first part thereof,) the forfeiture must stand or fall upon the fact of such declaration and notice, as it might be justified or not by the circumstances existing when they were made, and that whether the whole debt had become due or not, must rest ex-

clusively upon the alleged default, which had been found insufficient. And it was further held that under the same article which provided for a foreclosure on the written request of the holders of the majority of the outstanding bonds, even if the principal sum of the mortgage deed had been rightfully declared due and the required notice given, nevertheless the foundation for proceeding to foreclosure would fail without proof that the bill had been filed for that purpose upon such written request.

In the case at bar, the proof of the presentation and default upon the coupons was full and was not disputed. The mortgages specifically provided that upon such default continuing for sixty days after demand, the principal of all of the bonds should become immediately due and payable. The Texas Company and the Morgan Company both admitted that the principal had become due and payable. The instruments did not require a written request for a declaration by the trustee that the principal was due, or such a declaration and notification to the defaulting company, in order to make the principal mature. That was a consequence of a default continuing sixty days after demand. Nor was there any restriction upon the power to proceed by bill in equity, but on the contrary any intention to impose such a restriction was disavowed.

The Morgan Company insisted by its pleadings that it was justly entitled to be paid out of the proceeds of the sale decreed in preference to the first mortgage bonds, because, as it alleged, the Houston Company under which it claims advanced the amount in question to the Texas Company to be used for taxes, operating expenses, equipment, improvements, and other necessary expenditures, by which the Texas Company's railway had been kept in safe running order, its business and importance increased, and it thereby rendered more valuable to the first mortgage bondholders; that the indebtedness was contracted by the Texas Company upon consideration of its promise to pay the same out of the earnings of its railway; that (as is charged upon information and belief) the company had used at least $500,000 of said earnings during the years 1882, 1883 and 1884 for the payment of coupons of its first

mortgage bonds, although the holders of the coupons were only entitled to receive payment thereof after the Texas Company had paid the amounts advanced and paid as aforesaid; and that the Morgan Company was entitled to stand in the place and stead of said mortgage creditors for the amounts received. In other words, the contention seemed to be, that the Houston Company should be awarded priority of lien because it advanced the amount in question to be used in the payment of operating expenses and taxes, and it was so used: or upon the promise that it should be so used, which was broken by its diversion to the payment of interest; or, if there were no such promise, express or implied, then that the application of the advances to the payment of interest entitled the Houston Company to preference by way of subrogation, or because by such payment the Texas Company was kept running for five years, which without such payment would have been impossible.

We do not, however, understand it to be claimed·upon the evidence, that any express agreement is made out for the application of the advances to any particular purpose, or for the right of subrogation between the Houston Company and either the Texas Company or the first mortgage bondholders, or that any of the interest coupons upon the first mortgage bonds, which were paid by the Texas Company, were taken by the Houston Company as security for advances. But it is argued that the advances were for the payment of operating expenses, taxes and interest during five years, whereby the railroad property was preserved as a "going" concern; that at the time the road was constructed the country through which it ran was in a prosperous condition, but afterwards unfavorable conditions supervened and continued throughout the period covered by the advances; that "it was hoped and expected, however, that an improvement in the business of the road would take place, and that the company would be enabled to reimburse the advances;" that the advances were made to meet the particular deficits as they occurred from time to time, to pay operating expenses when there was a deficiency in the earnings, and to pay interest on the bonds when there

was not enough from the earnings to pay it, and, as a whole, constituted the ways and means of maintaining the good will and integrity of the enterprise, and preserving the property, business and franchises; and that, as all that was done by the Houston Company enured directly for the benefit of the public and of the property, it was just and equitable, "inasmuch as the expectations of the parties in regard to the enterprise were not realized, without any fault of theirs, that the mortgage securities should bear the loss which must be sustained either by the bondholders or the appellant."

From the account stated, it appears that the gross earnings were each year sufficient to pay the operating expenses and taxes, and that the deficit of each year was produced by the payment of interest on the bonded debt. But if the advances could therefore be treated as having been specifically procured for, or specifically applied to, the payment of interest as such, (although there is no evidence to that effect,) still such payment would afford no basis for the assertion of a preference as against the bondholders. So far as disclosed, the interest coupons were paid, not purchased, *Ketchum* v. *Duncan*, 96 U. S. 659; *Wood* v. *Guarantee Trust Co.*, 128 U. S. 416, and cannot be set up as outstanding; and the contention is wholly inadmissible that the bondholders, because they received what was due them, should be held to have assented to the running of the road at the risk of returning the money thus paid, if the company, by reason of unrealized expectations on the part of those who made the advances, should ultimately turn out to be insolvent and unable to go on. By the payment of interest, the interposition of the bondholders was averted. They could not take possession of the property, and should not be charged with the responsibility of its operation.

It is true that a railroad company is a corporation operating a public highway, but it does not follow that the discharge of its public excuses it from amenability for its private obligations. If it cannot keep up and maintain its road in a suitable condition, and perform the public service for which it was endowed with its faculties and franchises, it must give way to those who can. Its bonds cannot be confiscated because it

lacks self-sustaining ability.  To allow another corporation,. which for its own purposes has kept a railroad in operation in the hands of the original company, by enabling it to prevent those who would otherwise be entitled to take it, from doing so, a preference in reimbursement over the latter on the ground of superiority of equity, would be to permit the speculative action of third parties to defeat contract obligations, and to concede a power over the property of others which even governmental sovereignty cannot exercise without limitation.  And if all these advances should be considered as applied in payment of the operating expenses only, upon the theory, where such was not literally the fact, that they supplied a deficit created by the payment of interest out of the gross earnings, the same remarks would be applicable.

The doctrine of *Fosdick* v. *Schall,* 99 U. S. 235, is that a court of equity may make it a condition of the issue of an order for the appointment of a receiver, that certain outstanding debts of the company shall be paid from the income that may be collected by the receiver or from the proceeds of sale; that the property being in the hands of the court for administration as a trust fund for the payment of incumbrances, the court, in putting it in condition for sale, may, if needed, recognize the claims of material men and laborers, and some few others of similar nature, accruing for a brief period prior to its intervention, where current earnings have been used by the company to pay mortgage debt or improve the property, instead of to pay current expenses, under circumstances raising an equity for their restoration; as for instance where the company, being insolvent and in default, is allowed by the mortgage bondholders to remain in possession and operate the road long after that default has become notorious, or where the company has been suddenly deprived of the control of its property, and the pursuit of any other course might lead to cessation of operation.  *Miltenberger* v. *Logansport Railway,* 106 U. S. 286, 311, 312.  If the officers of the company, remarked Mr. Chief Justice Waite, in *Fosdick* v. *Schall,* "give to one class of creditors that which properly belongs to another, the court may, upon an adjustment of the accounts, so

use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights. . . . . Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that if there has been in reality no diversion, there can be no restoration; and that the amount of restoration should be made to depend upon the amount of the diversion." *Burnham* v. *Bowen,* 111 U. S. 776; *Union Trust Co.* v. *Illinois Midland Co.,* 117 U. S. 434.

In the light of these decisions, the inquiry before us is whether these bondholders are to be postponed in respect to the proceeds of the sale of the *corpus* of the property upon which their lien is first and paramount, to this claim of the Houston Company, upon the ground of the particular application of these moneys, or that they supplied a diversion by the officers of the Texas Company equitably binding as such upon the bondholders. Now, if these advances were made generally, as needed by the Texas Company, it matters not whether they were devoted to the payment of running expenses or not. The relation of debtor and creditor existed, and no equity could arise in favor of the creditor as against other creditors holding security prior in time, by reason of the voluntary application the debtor might make of the money borrowed. We repeat, that, so far as appears, the money advanced to one road by the other was simply a loan. The account between the companies was a running account, and the balance was only a balance for cash advances made from time to time. Moneys received from the operation of the Texas road and moneys received from the Houston Company all went into a common fund, from which payments were made for expenses, taxes, and so on. It is also shown that the Texas Company and the Houston Company had the same fiscal agent in New York, who paid the coupons of both; that the management of the Texas Company was, during its entire existence, in the hands of the same officers and directors who managed the Houston Company; that these officers derived their compensation from the Houston Company; that all receipts from the Texas Company were first received by the Houston Company

and then transferred on the books to the treasurer of both companies, as treasurer of the Texas Company ; that whenever there was a deficit of funds on the part of the Texas Company, such deficit was made up by the Houston Company ; and that the latter company received and disbursed everything. Under such circumstances, it cannot be maintained, against the first mortgage bondholders, that a balance of such a running account of five year's duration represents money so applied to the current expenses of the road, or so diverted therefrom to the payment of interest on the bonds, as to carry with it a superior equity for repayment. *Penn* v. *Calhoun*, 121 U. S. 251; *Kneeland* v. *American Loan and Trust Co.*, 136 U. S. 89; *St. Louis, Alton &c. Railroad* v. *Cleveland, Columbus &c. Railway*, 125 U. S. 658.

It is to be observed, also, that the Morgan Company counted upon the certificates of the Texas Company, whereby it bound itself to deliver to the Houston Company the third mortgage bonds as soon as executed by the Metropolitan Company as trustee, and asked for a decree against all the defendants, declaring the amount found due to complainant, as holder of such certificates, to be "a full, complete, perfect and equitable mortgage and lien upon said railway and upon all of the property, incomes, tolls and profits in said deed of trust of October 1, 1885, described" and prayed "that out of the proceeds of any sale which may be made to satisfy any decree of this honorable court your orator's claim for said amount be paid and satisfied." It is thus seen that the Morgan Company asserted its equities as based on the third mortgage bonds, which renders it still clearer that upon this record no reason exists for the subordination of the first and second mortgages to this claim. Our conclusion is, that the Circuit Court, while it decreed a lien to the Morgan Company, rightfully refused to give it preference over the paramount lien of the first and second mortgage bonds.

Notwithstanding the decree was properly rendered upon the merits, we are urged to reverse it upon the further ground that the bill of the Farmers' Company ought not to have been allowed to be filed, because not in time, and not a cross-bill,

and that, if treated as an original bill, it cannot be maintained, for want of jurisdiction, the Farmers' and Metropolitan Companies being citizens of New York, the Morgan Company of Louisiana, and the Texas Company of Texas.

Under the original bill filed by the Morgan Company, and on its application, the court had taken possession of the property of the Texas Company, through receivers. The Farmers' and Metropolitan Companies were then brought into court by an amended and supplemental bill, which prayed for an account of all liens and incumbrances on the property of the Texas Company and of all its assets, and for a decree adjudging the sums alleged to be due to the Morgan Company liens upon the net earnings of the Texas Company and all its property, superior in rank to the claims of the said trustees and of the holders of the mortgage bonds issued under the various deeds of trust, the giving of which had been set up in the original bill and copies thereto annexed; and that the amount due to it by reason of its advances to the Houston Company should be paid out of the net earnings, and if they proved insufficient, then that a sale be ordered of the property in bulk, and that the amount decreed to the Morgan Company be paid out of the proceeds in preference to the amounts due on the mortgage bonds. It was also specifically prayed, as has been stated, that the rights of the Morgan Company under the certificates given it by the Houston Company in lieu of the bonds issued under the third mortgage should be decreed to be an equitable mortgage upon the property of the Texas Company, and, inferentially at least, superior to the lien of the first two mortgages.

"A cross-bill," says Mr. Justice Story, (Eq. Plead. § 389,) "*ex vi terminorum*, implies a bill brought by a defendant in a suit against the plaintiff in the same suit, or against other defendants in the same suit, or against both, touching the matters in question in the original bill. A bill of this kind is usually brought, either (1.) to obtain a necessary discovery of facts in aid of the defence to the original bill, or (2.) to obtain full relief to all parties, touching the matters of the original bill." And, as illustrative of cross-bills for relief, he says

(§ 392): "It also frequently happens, and particularly, if any question arises between two defendants to a bill, that the court cannot make a complete decree without a cross-bill or cross-bills, to bring every matter in dispute completely before the court, to be litigated by the proper parties, and upon the proper proofs."

It seems to us that in order that a decree might be made upon the whole matter in dispute, brought completely before the court, the bill in question was necessary and was correctly styled a cross-bill. In no proper sense were new and distinct matters introduced by it, which were not embraced in the original and amended and supplemental bills, and while it sought equitable relief, it was such as, in point of jurisdiction over the subject matter, the court was competent to administer. It may be that, so far as it sought the further aid of the court beyond the purposes of defence to the original bill, it was not a pure cross-bill, but that is immaterial. The subject matter was the same, although the complainant in the cross-bill asserted rights to the property different from those allowed to it in the original bill, and claimed an affirmative decree upon those rights. A complete determination of the matters already in litigation could not have been obtained except through a cross-bill, and different relief from that prayed in the original bill would necessarily be sought. This bill was filed, on leave, before the testimony was taken, and though there should be as little delay as possible in filing bills of this kind, yet that was a matter entirely within the discretion of the court, which could have directed it to be filed even at the hearing. And whether this bill be regarded as a pure cross-bill, as an original bill in the nature of a cross-bill, or as an original bill, there is no error calling for the disturbance of the decree because the court proceeded upon it in connection with the other pleadings. The jurisdiction of the Circuit Court did not depend upon the citizenship of the parties, but on the subject matter of the litigation. The property was in the actual possession of that court, and this drew to it the right to decide upon the conflicting claims to its ultimate possession and control. *Minnesota Co.* v. *St. Paul Co.*, 2 Wall. 609; *Peo-*

ple's Bank v. Calhoun, 102 U. S. 256; Krippendorf v. Hyde, 110 U. S. 276.

The decree of the Circuit Court is

*Affirmed.*