## FIDELITY NAT. BANK & TRUST CO. OF KANSAS CITY v. KANSAS TELEPHONE CO. et al.
### No. 1500.

District Court, D. Kansas, First Division.
Sept. 12, 1934.

Justin D. Bowersock, Robert B. Fizzell, and John F. Rhodes, all of Kansas City, Mo., for plaintiff.

Roy D. Keehn, Cassius Poust, W. M. Keeley, and Chas. E. McGuire, all of Chicago, Ill., for claimant.

McDERMOTT, Circuit Judge.

By agreement of the parties, permission is granted to file this petition as of May 11, 1932. Consent is granted plaintiff to file, as of this date, a motion challenging the suffi-

ciency of the petition. Since the petition discloses no equitable grounds for preference or priority, but affirmatively alleges facts which negative such right, an order will be entered denying the claim of preference or priority, but allowing the amount as a common claim.

Stripped of its legal conclusions, it appears that the claimant, Jester, is and was at all times here involved, the receiver of the Mid-West States Utilities Company; that company owned substantially all of the common stock of the Kansas Telephone Company. The Kansas Telephone Company was a separate, distinct corporation, owning several telephone exchanges in Kansas. Bonds were issued by the Kansas Telephone Company on its properties and were sold to the general public.

The officers of the Kansas Company, forgetful of the fact that bonds were outstanding in the hands of innocent holders who were not interested in the holding company or its other subsidiaries, turned all the revenues of the Kansas Company to its stockholder, who in turn paid its bills. The petition herein so alleges. That this method was improvident, to say no more, is indicated by the fact that by December, 1931, taxes to the extent of more than $20,000 had become delinquent and had become a lien ahead of the bonds, as disclosed by the reports of the receivers herein. Despite a shrinkage in gross revenues of the Kansas Company of nearly 25 per cent., brought about by the depression, and despite the costs of receivership, the receivers appointed herein have been able to pay all their bills, all taxes, paid off back taxes and other accrued bills to the extent of $20,000, and still have some cash on hand.

The Kansas Company was thus in a bad way in the fall of 1931. But its gross revenues exceeded its labor bills and other current expense which must be promptly met. The holding company had not, however, saved enough of the excess to pay the bond interest maturing December 15, 1931. If that defaulted, as this petition alleges, the bondholders would be entitled to a lien on the revenues and would also exercise their right to foreclosure and a receivership. This, it is alleged, would stop the flow of money to the holding company's receiver; and it would. To prevent that, and to deprive the bondholders of their right to foreclose and their right to a lien on revenues ensuing upon default, the receiver of the holding company advanced money to the Kansas Company to pay its bond interest. The Kansas Company paid the bond interest due Decem-

ber 15, 1931, and foreclosure, with its appropriation of revenues, it was thought was staved off for another six months. This hope was abortive because a receivership on the grounds of waste did come in February following. Now, claimant says, he should be allowed a priority over the bondholders for this money voluntarily lent, without any security, to the corporation. The legal question, as I see it, is this:

If a stockholder, or anyone else, voluntarily lends money to a corporation to pay bond interest, is he, on foreclosure, entitled to priority over, or parity with, the bondholders? Does equity require that a vested lien be thus displaced?

The answer, it seems to me, must be in the negative. If a stockholder, or anyone else, wants to lend money to a corporation without security, it is his own business. But he cannot claim priority over or parity with secured creditors by such a voluntary act. Particularly is this so where the purpose of the loan, as is alleged here, is to deprive the bondholders of their right to revenues and to foreclosure which follow upon default.

No authorities are cited in support of this strange doctrine. On the other hand, an exhaustive opinion by Judge Walter H. Sanborn in Illinois Trust & Savings Bank v. Doud (C. C. A. 8) 105 F. 123, 133, 52 L. R. A. 481, quoting from an able opinion by C. J. Fuller in Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 177, 11 S. Ct. 61, 34 L. Ed. 625, is exactly opposed. In those cases creditors advanced bond interest to prevent foreclosure, and then claimed priority over or parity with the bondholders. Their claims were denied in convincing opinions from which I quote a part:

"The legal effect of the facts disclosed by this evidence was that the intervener loaned this $6,000 to the mortgagor to enable it to pay its interest on the mortgage debt in consideration of the agreement of the mortgagor to apply its current income, after payment had been made for the new addition, to the payment of this loan. The effect of this loan was to prevent the mortgagee from foreclosing its mortgage for default of this interest, and to keep the property in the control of the mortgagor until the contemplated addition was completed. The claim of a creditor for money loaned to pay interest on a mortgage debt is inferior in equity to the lien of a prior mortgage, and cannot be given a preference over it. This proposition is conclusively established by Penn. v. Calhoun, 121 U. S. 251,

252, 7 S. Ct. 906, 30 L. Ed. 915; Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 196, 11 S. Ct. 61, 34 L. Ed. 625; Southern Development Co. v. Farmers' Loan & Trust Co., 24 C. C. A. 497, 79 F. 212, 215; United States Trust Co. v. Western Contract Co., 26 C. C. A. 472, 81 F. 454, 464. In Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 196, 11 S. Ct. 68, 34 L. Ed. 634, Mr. Chief Justice Fuller, in delivering the opinion of the supreme court, upon this question aptly said:

" 'So far as disclosed, the interest coupons were paid, not purchased (Ketchum v. Duncan, 96 U. S. 659, 24 L. Ed. 868; Wood v. Guarantee Trust & Safe-Deposit Co., 128 U. S. 416, 9 S. Ct. 131, 32 L. Ed. 472), and cannot be set up as outstanding; and the contention is wholly inadmissible that the bondholders, because they received what was due them, should be held to have assented to the running of the road at the risk of returning the money thus paid, if the company, by reason of unrealized expectations on the part of those who made the advances, should ultimately turn out to be insolvent, and unable to go on. By the payment of the interest, the interposition of the bondholders was averted. They could not take possession of the property, and should not be charged with the responsibility of its operation. It is true that a railroad company is a corporation operating a public highway, but it does not follow that the discharge of its public excuses it from amenability for its private obligations. If it cannot keep up and maintain its road in a suitable condition, and perform the public service for which it was endowed with its faculties and franchises, it must give way to those who can. Its bonds cannot be confiscated because it lacks self-sustaining ability. To allow another corporation, which for its own purposes has kept a railroad in operation in the hands of the original company, by enabling it to prevent those who would otherwise be entitled to take it from doing so, a preference in reimbursement over the latter on the ground of superiority of equity, would be to permit the speculative action of third parties to defeat contract obligations, and to concede a power over the property of others which even governmental sovereignty cannot exercise without limitation. And if all these advances should be considered as applied in payment of the operating expenses only, upon the theory, where such was not literally the fact, that they supplied a deficit created by the payment of interest out of the gross

earnings, the same remarks would be applicable.' "

Other reasons are advanced in support of the claim, but in the light of these controlling authorities, warrant little attention. The additional reasons proceed upon the theory that the money was advanced for other purposes. In the face of the distinct and detailed averments in the petition that the moneys were advanced for the purpose of staving off foreclosure, which is of course the real fact, the other reasons might well be summarily dismissed. However, they may be shortly disposed of.

It is claimed that the moneys were advanced to enable the company to perform the service it owed to the public. A public utility does not cease functioning when a receiver is appointed. This particular company has discharged its public service efficiently under receivership for more than two years. Furthermore, except within the narrow limits of the six months rule hereafter discussed, I know of no rule by which the lien of bondholders can be displaced by unsecured loans made to keep a utility going.

It is claimed that by the receivership, revenues to which claimant, either as a stockholder or an unsecured creditor, was entitled, were diverted to bond interest. The petition alleges that the bonds were not a lien on revenues until after default. This again is not true in several respects. A receiver was appointed on February 27, 1932, to prevent the waste attendant upon sending the revenues to a stockholder instead of applying them on company taxes, bills, and interest accruing. Default in bond interest occurred April 15, and an action in foreclosure brought in June and the two cases consolidated. Between February and June no revenues were diverted to bond interest. They were used to pay current expense and taxes and other bills which the claimant had neglected to pay, his petition showing that instead of using the revenues to pay taxes, toll bills, etc., he appropriated $8,000 of the revenues to apply on his unsecured loan. As a matter of fact, nothing has yet been paid bondholders, and unless times improve, they will never be paid out of revenues. Still again, there was a default when the taxes came delinquent long before the receivership; that was a default, even though notice was not given thereof as a prerequisite of foreclosure, and by that default the bondholders did have a lien on the revenues even before the loan was made. As an unsecured creditor, claimant had no right to the revenues superior to secured creditors. As a stockholder, he is not entitled to revenues as such, unless holding companies are something apart under the law. Stockholders are entitled to dividends when declared out of net income, but not to gross receipts.

A strained effort is made to bring this loan for bond interest within the narrow limits of the six months rule first laid down by Justice Brewer while on the Circuit, in Blair v. St. Louis, etc., Ry. Co. (C. C.) 22 F. 471, and followed and sometimes broadened in a multitude of other cases. I do not burden this opinion with an analysis, or even citation, of these cases. Judge Lewis, speaking for Judge Walter H. Sanborn, Judge Phillips and himself, in Pettibone-Mulliken Co. v. Guaranty Trust Co. (C. C. A. 8) 25 F.(2d) 948, certiorari denied, Id., 278 U. S. 618, 49 S. Ct. 22, 73 L. Ed. 540, goes into the whole question with characteristic thoroughness and cites many of the cases. Those who care to explore the question more exhaustively may examine an extensive note in 40 A. L. R. page 8, or refer to the West Digest under Receivers, ⊗160. Suffice it is to say here that Judge Brewer's rule roughly was that a court of administration may accord priority to labor and bills for current supplies, incurred within six months prior to the receivership, where such labor and supplies were necessary to keep a railroad a going concern. Later cases gradually broadened it until the Supreme Court called a halt in Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 S. Ct. 415, 49 L. Ed. 717, where it was held that the rule was based on the ground that one buying railroad bonds understood and impliedly agreed that revenues must first be devoted to wages, coal, and supplies, and that if revenues were diverted from that purpose to pay bond interest, equity, enforcing the implied agreement, would require restoration. It was held that supplies furnished within six months could not be paid out of the corpus of the property ahead of the bondholders. Whether labor stood on a different footing was undecided. And in St. Louis & S. F. R. Co. v. Spiller, 274 U. S. 304, 311, 47 S. Ct. 635, 637, 71 L. Ed. 1060, the Supreme Court held that "by long established practice, the doctrine has been applied only to unpaid expenses incurred within six months prior to the appointment of the receivers."

That doctrine manifestly has no application here. The claimant is not claiming for wages or supplies. All bills for wages and supplies due when this money was loaned have long since been paid out of revenues—in fact had been paid when the receivers were

appointed. Nor was there any diversion of revenues to pay bond interest. The bond interest was paid, not from revenues, but from a loan made by claimant. There being no unpaid labor or supply bills, and no diversion of income to bondholders, the six months rule is not in the case.

Another theory, not quite clear to me, is advanced, predicated on what might have been. If it is that, if claimant had not paid the bond interest, the receivership would have come in December instead of February, the answer is, What of it? The receivers of the Kansas Company paid, from current revenues, all unpaid claims for labor and supplies in February; they could and would have done the same in December. Or, if the theory is that, had he not advanced the interest, there might have been a diversion of current earnings away from labor to bond interest, then there is nothing before me to support such an hypothesis, and it is inconsistent with other allegations that a receivership would promptly ensue. However, cases are not decided on hypotheses. The facts are all labor and supply bills have been paid, partly by the former management, partly by my receivers, out of revenues received for telephone service. The fact is a stockholder did lend money, without security, to its corporation. What would have been the result if other facts existed might be of academic interest, but of no present worth.

Much is said in the petition and supporting briefs about the claimant "anticipating income" by the loan to the company. I suppose most people who lend money, with or without security, anticipate repayment from income. Claimant is no more disappointed than the unfortunate bondholders in this respect. If he means to say that, as a creditor, he had a lien on future revenues to secure his loan, he sets out no such document, nor does he plead that there were any future revenues over and above the fixed and current expenses. Such a lien would be second to the bondholders, anyway, for confessedly the bondholders were entitled to a lien on revenues after default, and there was a default, at least in equity, many months before when state property taxes became delinquent and a lien ahead of the bonds. If he claims the right to gross revenues as a stockholder, it is enough to say that a stockholder, as such, has no right to gross revenues in Kansas, even if it is a holding company. It must wait for its participation until expenses, taxes and bond interest are paid; and that time has not come. If it does, claim-

ant's rights as a stockholder will be fully protected.

But I wander afield. In a letter, by way of brief, written September 4, 1934, claimant states his theory in the first paragraph as follows:

"It was necessary to the continued operation of the Kansas Telephone Company as a going concern to make payment of the interest in default December, 1931, upon its bonds, to prevent foreclosure receivership or the taking of possession by the Trustee under the Kansas bond trust indenture."

That theory is untenable, and no other need be considered. The letter then proceeds to say that claimant was deprived of the right to reimburse himself because the receivership cut him off from access to the gross revenues. It did, and thus justified the receivership, for bondholders, whose security is impaired by delinquent taxes and is being otherwise wasted, have rights superior to those of an unsecured creditor, even though he happens to have access to the till.