In re ST. LOUIS–SAN FRANCISCO RY. CO.

No. 7004.

District Court, E. D. Missouri, E. D.

July 25, 1942.

Larkin, Rathbone & Perry, of New York City, and Fordyce, White, Mayne, Williams & Hartman, of St. Louis, Mo., for Central Hanover Bank & Trust Co. and Daniel K. Catlin, trustees under Prior Lien Mortgage of St. Louis-San Francisco Ry. Co.

Milbank, Tweed & Hope, of New York City, for Chase Nat. Bank of City of New York and John A. Aid, trustees under the Consolidated Mortgage of St. Louis-San Francisco Ry. Co.

Nagel, Kirby, Orrick & Shepley, of St. Louis, Mo., for Third Nat. Bank of City of New York and John A. Aid, trustees under the Consolidated Mortgage of St. Louis-San Francisco Ry. Co.

White & Case, of New York City, and Bryan, Williams, Cave & McPheeters, of St. Louis, Mo., for Bankers Trust Co. and Walter W. Smith, trustees under Refunding Mortgage of Kansas City, F. S. & M. Ry. Co.

Bingham, Dana & Gould, of Boston, Mass., and Blayney, Bedal, Cook & Fairfield, of St. Louis, Mo., for Old Colony Trust Co., trustee under General Mortgage of Kansas City, M. & B. R. Co.

Hunton, Williams, Anderson, Gay & Moore, of Richmond, Va., and Chasnoff, Willson & Cunningham, and Roscoe Anderson, all of St. Louis, Mo., for John

W. Stedman and others, Prior Lien Mortgage Bondholders' Committee.

Cravath, deGersdorff, Swaine & Wood, of New York City, and Carter, Bull & Garstang, of St. Louis, Mo., for Frederick H. Ecker and others, Consolidated Mortgage Bondholders' Committee.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, and Charles P. Williams, of St. Louis, Mo., for James H. Brewster, Jr., and others, Kansas City, F. S. & M. Ry. Co. Refunding Mortgage Bondholders' Committee.

Russell L. Snodgrass, of Washington, D. C., and Hennings, Green, Henry & Evans, of St. Louis, Mo., for Reconstruction Finance Corporation.

William J. Kane, of Baltimore, Md., for Railroad Credit Corporation.

Willkie, Owen, Otis, Farr & Gallagher, of New York City, for Committee of Preferred Stockholders of St. Louis-San Francisco Ry. Co.

William V. Hodges, of New York City, and Jesse McDonald, of St. Louis, Mo., for debtor St. Louis-San Francisco Ry. Co.

Henry Morgenthau, Jr., Secretary of the Treasury, of Washington, D. C. (Designated by Executive Order No. 7263, Jan. 4, 1936, to act in respect of interest or claims of United States).

Frank A. Thompson, of St. Louis, Mo., for trustees, St. Louis-San Francisco Ry. Co.

MOORE, District Judge.

The St. Louis-San Francisco Railway Company, a Missouri corporation, the debtor, on May 16, 1933, filed a petition in this court stating that its property was then in possession of receivers appointed by this court; that it was unable to meet its debts as they matured and that it desired to effect a Plan of Reorganization under Section 77 of the Act of July 1, 1898, entitled "An act to establish a uniform system of bankruptcy throughout the United States" as amended, 11 U.S.C.A. § 205.

On May 17, 1933, the court entered an order approving the petition as properly filed and proceedings for the reorganization of the debtor were then begun and are now pending.

The court authorized the receivers, James M. Kurn and John G. Lonsdale, to

continue in possession of the property and to operate the business thereof during the period prior to the appointment of a trustee or trustees.

Effective October 1, 1933, the above-named receivers were appointed temporary trustees by the court and on October 28, 1933, those appointments were made permanent by an order of this court.

With the petition the debtor filed a Plan of Readjustment and pursuant to notice hearings on the plan were held by the Interstate Commerce Commission on July 18 and 19, 1933, and December 1, 1936.

The hearings were concluded on the latter date. The Commission, Division No. 4, in its report, 221 I.C.C. 199, decided March 17, 1937, concluded that approval at that time of any Plan of Reorganization of the debtor should be refused without prejudice to continuation of the proceedings and entered an order to that effect.

The debtor, on November 24, 1937, filed with the District Court and with the Interstate Commerce Commission a modified Plan of Reorganization. A hearing on this plan, pursuant to notice, was held by the Commission on February 8, 1938, and upon request of committees representing the holders of Fort Scott Prior Lien and Consolidated bonds, the hearing was adjourned to May 3, 1938. That hearing was postponed from time to time. On October 21, 1938, the said committees, pursuant to authority granted, filed with the Commission a Plan of Reorganization. The three committees were in agreement as to most, but not all, of the provisions. Further hearings pursuant to notice were held by the Commission on November 1, 2 and 3, 1938. A copy of the committee's plan was transmitted for filing to the clerk of the court by the Secretary of the Commission.

The committees' plan was supplanted at the hearing and modified on brief, agreement as to all provisions being finally reached. The court has permitted a large number of parties to intervene in these proceedings and many others were allowed to intervene and be heard by the Interstate Commerce Commission.

On June 5, 1933, and thereafter, the court divided the creditors and stockholders of the debtor into ten classes. It is unnecessary for the purpose of this opinion to describe herein the nature of the debtor's property and business, all of which is fully set forth and described in the reports of the Interstate Commerce Commission herein, to which reference is made.

On August 11, 1939, there was filed in these proceedings by the Interstate Commerce Commission a summary report prepared by the Examiners of the Commission. Objections and exceptions were duly filed to this report by the various intervenors and interested parties. Briefs were filed and the matter, including the objections, was fully argued before the Commission and submitted.

Thereafter, on July 6th, 1940, Division No. 4 of the Commission made its report in this matter. It might be said that most, but not all, of the matters contained in the Examiners' report were approved by Division No. 4, with the notable exception of the priority given to the Reconstruction Finance Corporation and the Railroad Credit Corporation, which will be more fully discussed. Exceptions and objections or petitions for modification of the order of the Commission by Division No. 4 of July 6, 1940, approving a Plan of Reorganization mentioned above, together with briefs in support thereof, were duly filed with the Interstate Commerce Commission. After due and extensive consideration of all said petitions for modification, and on November 16, 1940, the Interstate Commerce Commission filed a supplemental report and order in which the said plan of July 6, 1940, was modified in some particulars, and as so modified, as set forth in said order, said Plan of Reorganization was, in accordance with the law, certified to this court, and that is the plan now before this court for approval or disapproval pursuant to subsection e of Sec. 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. e. After said plan had been so certified by the Commission, as aforesaid, to this court, and on or about December 30, 1940, this court duly made and entered an order providing that all parties interested in the plan and having objections or motions to modify the same, should file said objections or motions in this court by January 31, 1941, and provided that all persons having claims in the reorganization matter under subsection c-(12) or otherwise, should file said claims for compensation or allowances on or before February 15, 1941, to include all claims for compensation down to January 31, 1941. This

was covered by Order No. 242. Said order further provided that March 19, 1941, be fixed as the time for hearing all parties in interest in support of and in opposition to any and all objections to the said Plan of Reorganization and any and all claims for equitable treatment and any and all petitions for allowances that may be filed.

Pursuant to this order, many objections were filed to the plan of July 6, 1940, and as modified by the order of November 16, 1940. The objections were filed by the following parties:

(1) The debtor,

(2) Central Hanover Bank & Trust Company, trustee under the Prior Lien Mortgage;

(3) John W. Stedman et al., Prior Lien Bondholders' Committee;

(4) Chase National Bank, trustee of the Consolidated Mortgage;

(5) Frederick H. Ecker, et al., Bondholders' Committee for Consolidated Mortgage Bonds;

(6) Owners of General Mortgage Bonds and Income Bonds of the Kansas City, Memphis & Birmingham Railway Company;

(7) Pennsylvania Railroad Company;

(8) Lola Brooks, Administratrix;

(9) John E. Dikis, Administrator;

(10) Elliott A. Spencer and Lillian A. Spencer, as owners of the old preferred stock of Fort Scott & Memphis Railway Company.

Many claims for allowance of compensation under subsection c-(12) and otherwise were also filed pursuant to said Order No. 242, which claims were promptly referred to the Interstate Commerce Commission and upon which claims a report was made to this court by the Interstate Commerce Commission on August 27, 1941.

On the 4th day of March, 1941, a pretrial conference was had in this matter at which arrangements were made for the submission of certain evidence and for the taking of further evidence by the debtor, all of which has been done and duly filed in and made a part of the record of these proceedings. This was before the court for consideration at the time of the argument on the objections to the plan above set forth, which took place in this court on July 9, 10, 11, 12 and 13, 1941.

On these last-mentioned dates, the objections to the said plan as modified were extensively, earnestly, clearly and very ably presented and argued to the court, and thereafter said objections were taken under submission.

The hearings on the said claims for allowance were continued to October 3, 1941, and were thereafter continued from time to time in certain particulars, principally for the reason the court had to await further action of the Commission before the final submission of some of the claims. However, a great majority of the claims have heretofore been submitted to the court upon the record made to the Interstate Commerce Commission and have been duly acted upon by the court.

At the conclusion of the able and extensive arguments of the parties, the court felt that it was fairly clear as to what the decision should be in the matter. Thereafter, the court has duly considered the record certified to it by the Commission and all of the additional testimony and evidence taken since the certification of the plan by the Commission and made a part of the record. The court has examined and re-examined the many briefs and arguments filed on the objections and in a large measure the court's first impressions of the entire matter have been confirmed and substantiated as will be set forth herein as briefly as possible.

In the hearings before the Commission a great deal of evidence and data were put into the record. As stated before, it is not necessary in this opinion to set forth the nature of the property involved in these proceedings. A reference to the various reports of the Interstate Commerce Commission mentioned above is made for a full description of the property, its traffic, its revenues, its yearly earnings and expenses. By direction of Division No. 4 of the Interstate Commerce Commission, pursuant to Section 77(c) (11) the Commission's Bureau of Valuation prepared and filed in the proceeding a report on its investigation of the elements of value and related matters of the debtor and its affiliated systems of companies as of December 31, 1936. From this, the Commission found that the cost of reproduction "less depreciation, plus the value of lands and rights and an allowance of $3,955,800 for working capital amounts to $242,656,-104.00". The Commission carefully con-

sidered the net income of the road for many years both before and during the depression and then the Commission having before it all of these matters for consideration, and being skilled in such matters, made the following finding: "Considering the entire record, and taking into account the reproduction value of the property remaining in service after the abandonments and the favorable past earnings, as well as the unfavorable recent earnings, it would appear that the total capitalization (of the new Company) after reorganization should be about $240,-000,000.00. Of the total capitalization proposed, rather less than half should be in the form of debt and rather more than half in the form of stock, of which the amount of no par common stock, taken at $50.00 a share, should somewhat exceed the preferred stock"—and accordingly determined that the new capitalization should be about as follows:

| | |
|---|---:|
| Equipment obligations undisturbed | $ 5,874,000.00 |
| New Birmingham Division First Mortgage 4% Bonds, due Jan. 1, 1970.. | 3,323,390.00 |
| New Birmingham Division Second Mortgage 4% Bonds, due Jan. 1, 1970.. | 3,182,780.00 |
| New First and General Mortgage Series A 4% Bonds due Jan. 1, 1990.. | 63,305,149.00 |
| New Second Mortgage Convertible 4½% Series A Income Bonds due Jan. 1, 2015 | 40,385,885.00 |
| New 5% Preferred Stock Series | 61,846,169.00 |
| New 5% Common Stock of no par value, 1,241,652.62 shares, stated at $50.00 per share | 62,082,631.00 |
| Total | $240,000,004.00 |

Under the proposed plan, the capitalization is reduced from $388,680,293 to $240,-000,000, no par common stock being taken at $50 a share and fixed interest charges are reduced from $12,613,106 to $3,000,017. The effective date of the plan is January 1, 1940. It is the view of the court that it is properly the province of the Commission to determine the capitalization of the new reorganized company, if based upon evidence and not arbitrary.

Appendix A, Sheet 1, attached to the Report of the Interstate Commerce Commission of July 6, 1940, sets forth in tabulated form the various claims of creditors and stockholders except those of general unsecured creditors of the debtor, the amount of each claim with interest accrued to January 1, 1940, and the distribution of new securities under the Commission Plan of Reorganization. A printed copy thereof is hereto attached, marked "Exhibit A", and made a part hereof.

The equities of the holders of both common and preferred stock of the debtor were found to have no value and no provision was made for the stockholders in the plan except the holders of 100 shares of preferred stock of the Kansas City, Fort Scott and Memphis Railway Company. The same is true as regards general creditors, because of lack of assets free from mortgage lien.

It was provided that the equipment obligations should remain undisturbed and that the new 30-year 4% divisional mortgage bonds should be distributed in exchange, par for par, to holders of the two issues of Kansas City, Memphis and Birmingham Railway Company bonds. It was provided that other new securities should be issued to holders of outstanding bonds according to the following table, the amounts stated being the amounts to be exchanged for each $1,000 bond, and pledgees being treated as though the pledged securities were outstanding:

| Outstanding Issue | New First and General Mortgage bonds | New Second Mortgage Income bonds | New Preferred stock | New Common stock [1] | Total | Unsatisfied Claims |
|---|---|---|---|---|---|---|
| Ft. Scott 4s [2] | $614 | $382 | $254 | $... | $1,250 | ... |
| Prior Lien 4s | 146 | 117 | 241 | 327 | 831 | 460 |
| Prior Lien 5s | 154 | 124 | 255 | 346 | 879 | 485 |
| Consolidated 4½s | 169 | 122 | 195 | 170 | 656 | 663 |
| Consolidated 6s | 185 | 133 | 213 | 185 | 716 | 724 |

[1] No par value stated at $50 a share
[2] Kansas City, Fort Scott & Memphis Railway Company.

Under the approved plan of the Commission about $7,000,000 par value of the First and General Mortgage Bonds provided for in the plan were assigned to the Reconstruction Finance Corporation and the Railroad Credit Corporation, and this amount of bonds was taken away from the holders of the lien bonds and the consolidated bonds, and the question whether or not this preference should have been given constitutes a most important dispute in connection with this reorganization. When the examiners put forth their proposed report on August 11, 1939, they denied this preference of about $7,000,000 to the Reconstruction Finance Corporation and the Railroad Credit Corporation, but in the subsequent report of Division 4 of the Commission and as modified by the full Commission, the preference was allowed. No part of this preference was deducted from the holders of the Fort Scott bonds in the hands of the public.

[1, 2] The initial duty of bringing forward a Plan of Reorganization under the law rests with the Interstate Commerce Commission. Because of its training and its experience in these matters, the Commission is in a preferred position to consider the reasonableness and soundness of such a Plan of Reorganization. Because this is generally recognized, the court feels it to be its duty therefore to give great weight to the recommendation or plan forwarded by the Commission on all phases, especially technical ones, but it is the peculiar province of this court to concern itself particularly with all legal and equitable questions involved.

As stated above, there have been many objections filed against the plan. In fact, there are only three or four of the parties who have been heard who favor the plan. They are the Reconstruction Finance Corporation, the Railroad Credit Corporation and the so-called Gans interest.

The committee representing the Fort Scott Bondholders did not file objections to the plan.

The debtor filed several objections to the plan and its counsel has submitted an elaborate and well-considered brief in support of these objections, and at the hearing learned counsel for the debtor presented an elaborate, enlightening and exceedingly interesting argument. All of the objections to the plan had been previously presented and argued to the Commission. All of them were considered by the Commission and the Commission held against the debtor's objections.

The debtor takes the position that the effective date of the plan should be the date of the filing of the petition in these proceedings and that secured creditors are not entitled to interest accruing on their claims after that date, except to the extent that such interest is earned. In the Missouri Pacific reorganization case, the debtor therein took a similar position and this court after a careful consideration of the matter reached the conclusion that the objections of the debtor were not well taken. See In re Missouri Pacific R. Co., 39 F.Supp. 436; also, Consolidated Rock Products Company v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. The position taken by the debtor on this subject is contrary to the position taken by the Interstate Commerce Commission in all reorganization plans which have been approved up to this time. The court is of the opinion that since this plan is to be referred back to the Commission for reconsideration, that the Commission will probably and properly decide upon some date later than January 1, 1940, as the effective date of the plan, although the court feels that this is a matter to be left to the Commission.

The debtor also states that the so-called elements of value referred to on page 80, and seq., of the Commission's report of July 6, 1940, is an unsworn statement not authorized to be filed by subsection c(11) of Section 77 of the Bankruptcy Act or otherwise. The Commission considered this objection and believes it not well taken and that the filing of the report in question was authorized by subsection c(11) and that it became by the terms of said subsection prima facie evidence of the facts therein stated, and this court perceives no error therein.

It might be said, however, that the debtor's main objection to the plan is that the Commission failed to determine the value of the property in reorganization, or rather that there has been no proper determination of the value of the property in order to determine whether or not there is any equity in the preferred or common stock.

The debtor claims that there has been no finding of insolvency of the debtor, and on that ground the plan may not be approved. The court is of the present opinion that it was not necessary that there be a finding of insolvency in so many

words, but that all that was necessary in this particular was for the Commission in the first instance to make a finding that the equity of the stockholders has no value. That was done by the Commission. It would seem that that would be sufficient. All of the decisions approving plans under Section 77 are to the same effect since the Commission has made no findings of insolvency in so many words in any case. But even if a finding of insolvency were necessary, it does seem to the court that such a finding as the Commission here made that all classes of stock are without value is in fact a finding of insolvency, for it does mean that the value of the assets is less than the amount of the debt obligations; so that the court is of the opinion that the finding of insolvency, although not necessary, has in fact been made by the Commission. The last paragraph of subsection e of Section 77 provides: "If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan. The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts."

In this connection, attention is called to subsection b(4) of Section 77, which requires that the Plan of Reorganization "shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof."

· What this court said on this subject in the Missouri Pacific case is equally applicable here. The court [39 F.Supp. 444] there said: "While the determination of value is not mandatory in every case, it is required where such a determination is necessary for any purpose. The reorganization plan in the instant case proposed the elimination of the interest of Missouri Pacific stockholders. To justify such treatment it would seem necessary to find that the value of the property was insufficient to show any present value in the stock. As hereinbefore quoted, the Act prescribes the basis for determination of such value. Did the Commission make any necessary finding of value in this case? If so, was it supported by substantial evidence offered in these proceedings?"

An examination of the report of the Commission as quoted above shows that the Commission considered the entire record and after taking into account the reproduction value of the property remaining in service after the abandonments, and the favorable past earnings, as well as the unfavorable recent earnings, found that the total capitalization for the new company should be about $240,000,000.

The reports of the Commission further indicate to the court that in arriving at this capitalization, the Commission did take into consideration all the elements to enable it to arrive at what the proper capitalization of the new company should be, and the court believes that this finding of the Commission which fixes the capitalization of the reorganized company at $240,000,000 is a finding of value which fully meets the requirements of the act in this particular. The court is informed of the recent opinions of the Court of Appeals for the 9th Circuit in Re Western Pacific R. Co., 124 F.2d 136, and of the 7th Circuit Court of Appeals in Re Chicago, Milwaukee, St. Paul & Pacific R. Co., 124 F.2d 754, and having carefully read the same the court finds nothing pertinent therein save that a finding of value is required. Those cases in no way indicate any impropriety in the Commission's manner of making that finding in the instant case.

The final determination of this question rests with the Supreme Court which may pass upon these objections raised by the debtor in the near future, and since the Plan of Reorganization is to be referred back to the Commission for the reasons hereinafter stated, the Commission should and will upon a reconsideration of the plan follow the controlling opinion of the Supreme Court should one be handed down dealing with the objections raised by the debtor in this proceeding.

128

This court has given its opinion herein upon these objections raised by the debtor as it appears to be the proper ruling at this time.

The Central Hanover Bank & Trust Company, trustee under the Prior Lien Mortgage and John W. Stedman et al., Committee representing Prior Lien Bondholders, the Chase National Bank, trustee of the Consolidated Mortgage and Frederick H. Ecker et al., a Bondholders' Committee for Consolidated Mortgage Bonds, object to the plan certified to the court on the ground that it improperly gives a preference to the Reconstruction Finance Corporation of $3,390,000 of the new First and General Mortgage Bonds, and $3,691,060 of such bonds to the Railroad Credit Corporation.

These First and General Mortgage Bonds in the distribution provided for in the plan are taken away from the Prior Lien Bonds and the Fort Scott Bonds which are pledged to secure the Consolidated Bonds, but are not taken from the Fort Scott Bonds in the hands of the public. The parties just above mentioned claim that this is inequitable and unjust and necessitates the plan being sent back to the Commission for reconsideration.

The court takes the view that the question here is a question of law and equity, pure and simple, and that it is the duty of this court to decide it as such. The question is not without difficulty. It has been given painstaking consideration by the court and the court has rather reluctantly come to the conclusion that the Commission has erred in this matter; that the preference should not be allowed and cannot in equity and in good conscience be sustained. The question has been extensively briefed by the above-mentioned objectors.

The Consolidated Bondholders' Committee, the Reconstruction Finance Corporation and the Railroad Credit Corporation have each filed lengthy briefs largely devoted to this preference. These have each been considered by the court. It is quite difficult to state the facts surrounding the matter of this priority briefly.

There should first be a statement with reference to the origin of the debt of the Reconstruction Finance Corporation and the Railroad Credit Corporation. As a result of the depression which began in 1929, the earnings of the debtor available for fixed charges decreased sharply. Such earnings of the debtor were $22,692,000 in 1929, $18,405,000 in 1930 and only $10,000,000 in 1931. Fixed charges in 1931 aggregated $13,300,000 or $3,300,000 in excess of available earnings. Market prices of the debtor's securities declined so sharply that it was impossible to raise money by the sale of securities. As a result of this situation, the debtor found itself at the beginning of 1932 unable to pay interest charges and taxes due in the early part of that year. Accordingly, in January, 1932, the debtor made application for loans to Reconstruction Finance Corporation and Railroad Credit Corporation. On February 27, 1932, the Reconstruction Finance Corporation, with the approval of the Interstate Commerce Commission, lent the debtor $2,805,175 secured by pledge of $4,014,000 of Consolidated Six Per Cent Gold Bonds Series B. The proceeds of the loan were used to the extent of $2,471,000 to pay interest maturing March 1, 1932, on Consolidated Mortgage Bonds, Series A. The balance was used largely to pay interest on Kansas City, Memphis & Birmingham Bonds and on Equipment Trust Certificates. A second loan of $1,800,000 was made by the Reconstruction Finance Corporation on May 6, 1932, secured by $3,679,000 principal amount of Consolidated Mortgage Six Per Cent Bonds, Series B. At the same time Railroad Credit Corporation took over from Reconstruction Finance Corporation (pursuant to an agreement made between Reconstruction Finance Corporation and Railroad Credit Corporation when the loan of $2,805,175 was made) the original loan of $2,805,175 with its collateral, and released $2,000,000 of the collateral to be used as part of the collateral for the new Reconstruction Finance Corporation loan.

The proceeds of this second loan (to which no preference is granted by the Commission Plan) were used to pay taxes on the property of the debtor and maturing Equipment Trust obligations.

This second loan was approved by the Interstate Commerce Commission and by Reconstruction Finance Corporation on the condition that before any advance upon the loan was made the debtor should agree with Reconstruction Finance Corporation to present for the approval of the Commission prior to July 1, 1932, a plan to effect a substantial reduction of its fixed interest charges. By letter dated May 2, 1932, the debtor agreed with Reconstruction Finance Corporation that it would submit a plan in accordance with the fore-

going requirement. The debtor called into consultation the five principal investment banking houses, which had participated in the issue of the debtor's securities (Speyer & Co., J. & W. Seligman & Co., Guaranty Trust Company of New York, Dillon, Read & Co. and Chase Securities Corporation), to discuss the terms of a plan. Later, there were also called into consultation representatives of the insurance companies and savings banks, who were large holders of the debtor's securities. After active, continuous negotiations and conferences (including conferences with representatives of the Commission, Reconstruction Finance Corporation and Railroad Credit Corporation) extending over a period of about two months, a plan was devised providing for the extension of certain nearby maturities and for a moratorium on a substantial part of the debtor's interest charges. The plan so devised is called the 1932 Plan. While the 1932 Plan was in the course of preparation successive drafts were from time to time submitted to counsel for the Reconstruction Finance Corporation. While the majority of the institutional security holders who participated in the conferences on the preparation of the 1932 Plan finally agreed to accept the 1932 Plan, there were a number who did not, preferring an immediate receivership to a moratorium sustained by further loans. Others objected to certain terms of the proposed plan. The Reconstruction Finance Corporation, Railroad Credit Corporation and the Commission were advised of the refusal of these institutions to accept the 1932 Plan. Some of those who did agree to accept the plan did so reluctantly, not because they approved the policy of postponing trouble by further loans, but because they believed the Reconstruction Finance Corporation, the Railroad Credit Corporation and the Commission, acting in accordance with the policy of the administration, wished to prevent railroad receiverships, and they were willing to co-operate.

Meetings were held on June 9th and 11th, 1932, which were attended by representatives of the Commission, the Reconstruction Finance Corporation, and the Railroad Credit Corporation, and by representatives of the debtor, the investment bankers mentioned above and some of the institutional investors who had participated in the negotiation of the 1932 Plan. At those meetings, the proposed terms of the 1932 Plan were discussed in detail.

On June 24, 1932, at a special meeting of the Board of Directors of the Reconstruction Finance Corporation, certain resolutions were adopted with reference to another loan to the debtor. These resolutions authorized a further loan of $3,390,000 to the debtor upon certain conditions, the pertinent ones to be here considered being conditions numbers 7 and 8, which read:

"7. Upon the consummation of the Plan this corporation shall be entitled to delivery of the $3,390,000.00 emergency bonds provided for in the Plan.

"8. There shall be furnished assurances of the following insurance companies, bankers and bank creditors of co-operation in effecting the Plan:

### Insurance Companies

Metropolitan Life Insurance Company
The Prudential Insurance Company of America
Aetna Life Insurance Company
John Hancock Mutual Life Insurance Company

### Bankers

Chase Securities Corporation
Dillon, Read & Co.
Speyer & Co.
J. & W. Seligman & Co.
Guaranty Company of New York

### Bank Creditors

Chase National Bank & Trust Company
Guaranty Trust Company
Central Hanover Bank and Trust Company
Bankers Trust Company
First National Bank of St. Louis
Mercantile-Commerce Bank & Trust Company of St. Louis."

This resolution contemplated no commitment from anyone except the debtor, other than a commitment to co-operate in effecting the 1932 Plan, and the only commitment required from the debtor was a commitment to pledge "emergency bonds" upon the consummation of the 1932 Plan.

On June 27, 1932, the debtor formally submitted the so-called Plan of 1932 to the Reconstruction Finance Corporation and to the Commission.

The Commission, by its report and certificate entered June 29, 1932, approved a further loan of $3,390,000 by Reconstruction Finance Corporation to the debtor.

The Commission said with reference to the 1932 Plan:

"As a condition of the loan of $1,800,000.00 we required the applicant to present for our approval prior to July 1, 1932, a plan to effect a substantial reduction in its fixed interest charges. The applicant has submitted a plan designed to accomplish this result. Under the plan the six banks holding the loans hereinbefore referred to have filed with the Corporation (R.F.C.) and with us statements assenting to the plan and agreeing to accept the treatment therein provided for on extension of those loans to July 1, 1942."

"The Plan as proposed has the support of banking interests, insurance companies, and other holders of large blocks of the applicant's securities, including its bonds, and this support is very substantial in character. Inasmuch as the Plan, before it can be consummated, must be formally presented to us for our approval under Section 20a, we cannot appropriately approve it now or until all who may wish to object shall have had an opportunity to present their objections. The Plan and the support which it has received, do, however, furnish reasonable assurance that the ends desired can be largely accomplished. This support is evidenced by letters addressed to the corporation and to us, and filed in our docket in this proceeding, in which the writers approve the Plan and agree to use their best efforts to cause it to become effective and to be adopted. These include letters bearing the signature of the following banking institutions which have participated in the issue and distribution of the applicant's securities:

> Chase Securities Corporation
> Dillon, Read & Co.
> Speyer & Co.
> J. & W. Seligman & Co.
> Guaranty Company of New York."

"They also include letters signed by insurance companies with large holdings of the applicant's bonds. These are:

> Metropolitan Life Insurance Company
> The Prudential Insurance Company of America
> Aetna Life Insurance Company
> John Hancock Mutual Life Insurance Company."

"The applicant represents that other large holders of its securities have agreed to support the plan, and that it has reason to believe that the plan will meet with general acceptance and will have the support of the large majority of its security holders. The plan presented, under all the circumstances, shows commendable cooperation by applicant's creditors."

"The plan, including the loan now requested, will prevent a receivership on July 1st. It is designed to be accomplished without any receivership, or at least without a foreclosure. The avoidance of a receivership or foreclosure we believe to be very desirable * * *"

"Conclusion.

"Considering the collateral now to be pledged as security for the loans and the assurance which the plan appears to offer that additional underlying those now pledged will later be available for additional security, we believe we are justified in making the finding that the Corporation will be adequately secured."

It was the duty of the Interstate Commerce Commission to see that the Reconstruction Finance Corporation was adequately secured. It is perfectly plain from the above report of the Commission that the Commission felt sure that the Plan of 1932 would be consummated and that when it was consummated the additional bonds provided for therein to be pledged to secure the R. F. C. loan would be pledged. But the thing that brought about all the trouble was that the condition of the times changed; the earnings of the railroad continued to fall off. Everyone was opposed to the consummation of the 1932 Plan eventually and, instead of it going through as the Commission supposed it would, it was abandoned.

On June 30, 1932, pursuant to the resolutions of the Commission above set forth, the Reconstruction Finance Corporation lent the debtor the additional $3,390,000. This loan was secured by a pledge of $3,575,000 principal amount of Consolidated Mortgage Bonds ($2,014,000 of which were provided by a release by Railroad Credit Corporation of the collateral previously held by it) and $246,000 principal amount of Prior Lien Bonds. The money so loaned was used to pay interest on July 1, 1932, on the Prior Lien Bonds and taxes. These were the only loans made by the Reconstruction Finance Corporation or Railroad Credit Corporation, except for a further loan of $1,000,000 made by Railroad Credit Corporation on August 1, 1932.

It will be seen that the Reconstruction Finance Corporation is the holder of notes of the debtor of an unpaid principal amount of $5,190,000. The total claim of the Reconstruction Finance Corporation, including

accrued interest to January 1, 1940, is $7,-359,533. This claim is secured by pledged collateral of an aggregate principal amount of $7,500,000, consisting of $7,254,000 in principal amount of Consolidated Bonds and $246,000 in principal amount of Prior Lien Bonds. The Railroad Credit Corporation is the holder of notes of the debtor of an unpaid principal amount of $3,307,431.

The total claim of the Railroad Credit Corporation, including accrued interest to January 1st, 1940, is $3,691,060. This claim is secured by a second lien on the collateral held by the Reconstruction Finance Corporation and by the debtor's distributive share of funds deposited under the Marshalling and Distributing Plan.

The debtor's distributive share under the Marshalling and Distributing Plan may be disregarded as not materially affecting the questions involved, so that the Railroad Credit Corporation may be considered as merely a pledgee of the equity in the $7,-500,000 aggregate principal amount of Consolidated Bonds and Prior Lien Bonds primarily pledged to secure the claim of the Reconstruction Finance Corporation. The value of the pledged collateral held by the Reconstruction Finance Corporation is less than the amount of the claim of the Reconstruction Finance Corporation and, therefore, the Railroad Credit Corporation is in the position of an unsecured creditor. The Commission found that the claims of unsecured creditors have no value.

The Commission Plan, after allocating to the Reconstruction Finance Corporation the new securities issuable in respect of the $7,500,000 aggregate principal amount of Consolidated Bonds and Prior Lien Bonds constituting the pledged collateral held by the Reconstruction Finance Corporation, then proceeded to allocate $3,390,000 in principal amount of First and General Mortgage Bonds to the Reconstruction Finance Corporation, and $3,691,060 in principal amount of such bonds to the Railroad Credit Corporation in recognition of the rights alleged to have arisen by virtue of special equities hereafter referred to.

The result is to create priorities in favor of the Reconstruction Finance Corporation and the Railroad Credit Corporation as against all holders of the Consolidated Bonds and the Prior Lien Bonds.

The Reconstruction Finance Corporation and the Railroad Credit Corporation contended before the Commission and here that special equities exist in their favor by reason of circumstances under which their loans were made in 1932, entitling them to receive under any Plan of Reorganization of the debtor the priorities contemplated by the Debtor's Plan and Agreement of Readjustment dated July, 1932. The 1932 Plan provided for the pledge with the Reconstruction Finance Corporation upon consummation of the 1932 Plan of $3,390,000 in principal amount of "New Prior Bonds".

In the proceedings before the Commission these contentions were asserted by the Reconstruction Finance Corporation and the Railroad Credit Corporation upon the basis of special equities arising out of certain agreements made in connection with the 1932 Plan. The Commission, however, in its report dated July 6, 1940, and in its supplemental report and order dated November 16, 1940, based its treatment of these contentions, it seems, upon a wholly different ground, namely, the existence of special equities arising out of the purposes for which the loans of the Reconstruction Finance Corporation and Railroad Credit Corporation were made.

It is very earnestly and vigorously argued by the Consolidated Bondholders' Committee and the Prior Lien Bondholders' Committee and the trustees of the mortgages for the Consolidated Bondholders and the Prior Lien Bondholders that the priorities accorded to the Reconstruction Finance Corporation and the Railroad Credit Corporation cannot be sustained either on the basis of special equities arising out of the agreement made in connection with the 1932 Plan, or on the basis of special equities arising independent of those agreements. They insist that the Commission Plan providing for the priorities herein mentioned discriminates unfairly against the holders of Consolidated Bonds and Prior Lien Bonds and in favor of the Reconstruction Finance Corporation and the Railroad Credit Corporation over all holders of Consolidated Bonds and Prior Lien Bonds, irrespective of whether or not they assented to the 1932 Plan.

These priorities cannot be sustained unless it can be shown either that the holders of these bonds agreed to give such priorities, or that special equities exist in favor of the Reconstruction Finance Corporation and the Railroad Credit Corporation independent of any such agreements which are superior to the rights of the holders of these bonds.

The only agreements made in connection with the 1932 Plan, so far as the record discloses, were the following:

"(1) The agreements contained in the 1932 Plan itself, which plan was assented to by some, but not all, of the holders of Consolidated Bonds and the Prior Lien Bonds.

"(2) The agreements contained in certain communications from bank creditors holding notes of the Debtor secured by the pledge of Consolidated Bonds, assenting to the 1932 Plan and agreeing to accept in respect of their holdings the treatment therein provided.

"(3) The agreements contained in certain communications from four insurance companies holding bonds of the Debtor, agreeing to accept the 1932 Plan in respect of their holdings and, in some instances, agreeing to use their best efforts to cause that plan to be carried out.

"(4) The agreements contained in certain communications from the Debtor, agreeing (a) to pledge with the R. F. C. and the R. C. C. the 'New Prior Bonds' provided for under the 1932 Plan, if and when said Plan or any modified plan, containing provisions substantially the same as the provisions of Article III of said plan in regard to the 'New Prior Mortgage', should be consummated and such 'New Prior Bonds' issued and (b) to use its best efforts to cause the 1932 Plan to be consummated, either in its then present form or in such other form as would permit the issue and pledge of such 'New Prior Bonds'; and

"(5) The agreements contained in certain communications from five investment banking houses, agreeing (a) to use their best efforts to cause the 1932 Plan to become effective and (b) should any substantial modification prove necessary, to use their best efforts so that any modified plan would contain provisions substantially the same as the provisions of Article III of the 1932 Plan in regard to the 'New Prior Mortgage'."

 The agreements made by the debtor and by the five banking houses were, of course, not binding upon any of the holders of the Consolidated Bonds or the Prior Lien Bonds. The agreements made by those holders of bonds who assented to the 1932 Plan obviously were not binding upon those holders of bonds who did not assent to the 1932 Plan. None of the agreements made in connection with the 1932 Plan ever became binding upon all of the holders of Consolidated Bonds or Prior Lien Bonds. No argument is needed to demonstrate that the granting to the Reconstruction Finance Corporation and the Railroad Credit Corporation of priorities over all holders of Consolidated Bonds cannot be predicated upon agreements which became binding upon only some of those holders.

Those holders of Consolidated Bonds and Prior Lien Bonds who assented to the 1932 Plan agreed merely that the Reconstruction Finance Corporation and the Railroad Credit Corporation should receive the priorities provided for in the 1932 Plan upon the terms and conditions specified in that Plan and as part and parcel of the scheme of readjustment provided for in that plan. By the very terms of the 1932 Plan, the granting of those priorities to the Reconstruction Finance Corporation and the Railroad Credit Corporation was conditioned upon the consummation of the 1932 Plan and the agreements of the assenting bondholders to the granting of those priorities was conditioned upon the 1932 Plan being carried out in its entirety. None of the holders of Consolidated or Prior Lien Bonds ever agreed to the granting of priorities to the Reconstruction Finance Corporation and the Railroad Credit Corporation under any other plan.

It is true, that under Article IX of the 1932 Plan, the readjustment managers were given rather broad powers to modify the 1932 Plan, but those powers were expressly limited by a provision giving a right of withdrawal to security holders adversely affected to a material degree by any proposed modification. In other words, no securityholder who assented to the 1932 Plan was bound to accept any proposed modification which adversely affected his interests to a material degree. The limitation emphasizes that the assents were conditioned upon the consummation of the 1932 Plan. The plan certified by the Commission to this court is not the 1932 Plan, and none of the holders of Consolidated Bonds or the Prior Lien Bonds have assented to it. The Commission Plan is so fundamentally different from the 1932 Plan that an assent to the latter cannot conceivably imply an assent to the former.

The 1932 Plan was essentially a plan for the readjustment of interest charges. It contemplated no scaling down of principal indebtedness and contemplated no change in the lien position of the various

bond issues, except for the priorities granted to the Reconstruction Finance Corporation and the Railroad Credit Corporation. The plan certified by the Commission, on the other hand, contemplates a drastic scaling down of principal indebtedness and contemplates a radical change in the lien position of the various bond issues. The priorities granted to the Reconstruction Finance Corporation and the Railroad Credit Corporation in the Commission Plan entail a much greater sacrifice of the rights of the holders of Consolidated Bonds and Prior Lien Bonds than did the priorities granted to the Reconstruction Finance Corporation and the Railroad Credit Corporation in the 1932 Plan.

To say that those holders of Consolidated Bonds and Prior Lien Bonds, who by assenting to the 1932 Plan, agreed upon its consummation to grant the Reconstruction Finance Corporation and the Railroad Credit Corporation the priorities specified in that plan thereby agreed to grant the Reconstruction Finance Corporation and the Railroad Credit Corporation different priorities under a different plan is to disregard the plain facts in the record and to make an agreement for those bondholders which they never made and never contemplated.

The court has carefully examined the authorities cited in the Commission's report and in the briefs of counsel for the Reconstruction Finance Corporation and the Railroad Credit Corporation and has reached the conclusion that the priorities given to the Reconstruction Finance Corporation and the Railroad Credit Corporation in the plan of the Commission cannot be sustained on the ground that there are special equities arising in their favor out of the lending of the money in 1932 and the character of its use. Morgan's Co. v. Texas Central Railway, 137 U.S. 171, 11 S.Ct. 61, 34 L.Ed. 625; Illinois Trust & Savings Bank v. Doud, 8 Cir., 105 F. 123, 52 L.R.A. 481; Southern Development Co. v. Farmers' Loan & Trust Co., 5 Cir., 79 F. 212; Kneeland v. American Loan Co., 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379.

A very careful review of the record shows that the facts in regard to this matter are really undisputed and they show conclusively that the agreement and understanding of the Commission, the debtor, the reorganization managers, the institutional bondholders, the investment bankers and the bondholders ultimately depositing their bonds was that the Reconstruction Finance Corporation and the Railroad Credit Corporation were to receive as collateral, additional in respect to the Reconstruction Finance Corporation for the loans mentioned above, bonds of the character mentioned in the Plan of Readjustment of 1932 in the event, and only in the event, that the plan in its initial form or some modified form was consummated and became the Plan of Readjustment of the debtor. The many bondholders who never deposited their bonds at all could not be bound or be subject to that agreement at all, and yet the plan certified would take away from those bondholders an interest in the new securities to which they are lawfully entitled. The parties doubtless thought that the plan, in its original form, or some modified form, to which all the bondholders assented, would be consummated and, therefore, the parties, including the Commission, thought in good faith that the loans mentioned above were properly secured.

The law required that the Commission was to see that the Reconstruction Finance Corporation was properly secured, and the Commission did think that in all probability the plan would be consummated and the Reconstruction Finance Corporation would receive the additional collateral to secure it. But with conditions and times entirely changed, the plan turned out to be ill-advised and, of course, it could not be consummated in any form, and when it failed, the Reconstruction Finance Corporation and the Railroad Credit Corporation necessarily failed to get the security which they had expected to get in the form of the bonds mentioned in the Plan of 1932. But now, under entirely different circumstances, it is proposed in the plan certified to give these agencies securities equal to those they would have received under the 1932 Plan. In other words the Reconstruction Finance Corporation and the Railroad Credit Corporation are to be accorded substantially the same treatment they were promised on the condition that the 1932 Plan was adopted, while on the other hand all other parties are to be given a totally dissimilar treatment and one which was not within the purview of any agreements made.

Even though the money obtained by the company from the loans was used in part to pay interest and to pay taxes and for other corporate expenses, under no principle of law and equity can the claims of the Reconstruction Finance Corpora-

tion and the Railroad Credit Corporation be placed ahead of the bondholders. The authorities cited by the Commission to sustain this so-called equity on the theory of an equitable lien are not in point. Neither are the other cases cited allowing materialmen liens ahead of bonds coming under the so-called six months' rule.

Since the court finds the bondholders have not assented that their bonds be subrogated or deferred to the claims of the Reconstruction Finance Corporation and the Railroad Credit Corporation in respect to this collateral, this court would have no authority to take away part of their property and really compel them to consent to the claims of the Reconstruction Finance Corporation and the Railroad Credit Corporation.

Counsel for some of the bondholders in their zeal and earnestness to represent their clients have urged upon the court the argument that the Commission made a mistake in failing to see that the Reconstruction Finance Corporation was properly protected with collateral at the time the loans were made, and that in order to correct this mistake, the Commission has taken the position of an advocate for the Reconstruction Finance Corporation in providing for the preference for the Reconstruction Finance Corporation and the Railroad Credit Corporation contained in the certified plan. The court is not impressed in the slightest degree by this argument, and is fully convinced that the action of the Commission was prompted by what it conceived to be equity and good conscience, and this court really regrets that it cannot agree with the Commission on this matter.

The Consolidated Bondholders' Committee urges an objection to the plan that the action of the Commission in finding the value and establishing a new capitalization of $240,000,000 is arbitrary and unwarranted because of the fact that the Commission in finding such value and fixing such capitalization did not take into consideration the prospective earnings of the Company, and takes the position that the Commission should have made a special finding as to the prospective earnings of the company. It is true that under the provisions of the act the prospective earnings should be taken into consideration in fixing the value or the amount of the new capitalization of the company. An examination of the reports of the Commission on this subject convinces the court that the action of the Commission in this respect was not arbitrary, and that the prospective earnings of the properties were taken into consideration in fixing the new capitalization, even though the Commission did not expressly state that it did take into consideration the prospective earnings of the company.

On page 42 of the report of the Commission of July 6th, the Commission said: "Should income available for interest, other requirements, and dividends equal that of 1931, viz., $10,288,049, which is reasonably possible, there would be approximately $1,018,748 for payment of dividends on the common stock or enough to pay dividends thereon at the rate of about 82¢ a share."

It, therefore, seems fairly clear to the court that prospective earnings were taken into consideration by the Commission in fixing the proposed new capitalization of $240,000,000. Since, however, the plan is to be reconsidered by the Commission, if it be a fact that prospective earnings were not taken into consideration by the Commission, then this court would, of course, want the Commission to give consideration to the prospective earnings and state in their report that they have given such consideration. If it be true that the Commission did not give such consideration to the prospective earnings, and upon reconsideration does give such consideration which results in finding that a larger capitalization is warranted, the Commission should be free to reconsider the matter upon argument by the interested parties. If for any reason the Commission desires to bring forth a new and different plan, with a new authorized capital structure, it should be free to do so.

The same is true of the objection of the Consolidated Bondholders' Committee and the Chase National Bank, Trustee for the Consolidated Bondholders, to the alleged failure of the ICC to take into consideration the unusual amounts expended for the upbuilding and the maintenance of the road during the time it has been in receivership and trusteeship, which, along with the alleged failure to consider prospective earnings, it is contended, has worked to lower the reorganization value which should be placed on the property to the injury of the balance of the Prior Lien claims and the Consolidated Junior Lien claim. The court feels that the Commission did take this element into consideration in fixing value, but that if it did not, then the interested parties should be free to urge that upon the Commission also.

The Consolidated Bondholders' Committee argue very strenuously their objection that the plan does not provide for what is called the Junior Lien claim.

The Consolidated Committee have pointed out that their mortgage is principally a collateral indenture secured by a pledge of Fort Scott Bonds and Prior Lien Bonds. They also are secured by an intermediate lien on the Fort Scott properties ahead of the Prior Lien Mortgage and then the Consolidated Bonds are secured by a lien on the whole system junior to the Fort Scott mortgage and the Prior Lien Mortgage. That lien is designated as the Consolidated Junior Lien and that part of the total claim of the Consolidated Bonds which exceeds the security provided by the pledged bonds and the so-called intermediate lien is called the Consolidated Junior Lien and amounts to approximately $57,000,000. The Consolidated Bondholders' Committee insists upon the recognition of this claim and objects to the plan because it is not considered and taken care of in some manner. Of course, the reason that it is not taken care of is that the Commission has fixed a reorganization value of $240,000,000. Of this amount, $62,-000,000 is represented by common stock of no par value, but upon which a value of $50 per share is placed. When these securities are distributed to the securities ahead of the Consolidated Junior claim, it is discovered that a large part of the Prior Lien claim amounting to about $87,000,000 is not taken care of in securities so that, of course, there are no securities under this valuation or capitalization to take care of this so-called Consolidated Junior claim, and if the capital is maintained at $240,000,000 it does not seem possible that by providing for a greater number of shares of common stock, the balance of the Prior Lien claim and any part of the so-called Consolidated Junior claim could be taken care of; and, in any event, even if the amount of capital in reorganization be increased so as to provide securities to take care of those unsatisfied claims, the securities to be given to the Prior Lien claim must be of higher or superior quality than the securities to be given for the Consolidated Junior claim.

If, upon a reconsideration of this case by the Commission, the Commission comes to the conclusion that it did not properly take into consideration the prospective earnings of the company as well as the unusual amount expended for additions and betterments during receivership, then the Commission might very well hold that a larger capitalization would be authorized and thus provide more securities which would take care in whole or part of both the unsatisfied Prior Lien claim and the Consolidated Junior claim. All of these matters will, of course, be considered by the Commission since this plan is to go back to it.

The Prior Lien Committee objects to the plan and contends that the rates adopted by the Commission for the conversion of new income bonds and preferred stock into common stock are too high. The rates provided are thirty shares of new common stock per $1,000 principal amount of new income bonds through January 1, 1945, and twenty-five shares thereafter, and two shares of new common stock for one of preferred stock. The Prior Lien Committee proposes that these amounts be cut in half. The court finds that this argument was presented extensively to the Commission and was evidently considered by the Commission and it held against the contention of the Prior Lien Committee. This contention is opposed by the Kansas City, Fort Scott & Memphis Committee and after full consideration the court believes that the action of the Commission in this respect was proper.

Certain holders of the Birmingham Bonds object to their treatment given in the plan. There are over $6,000,000 of these bonds outstanding. About half of them are 4% First Mortgage Bonds and the other half 5% Income Second Mortgage Bonds. The bonds are due. The interest has been paid on these bonds up to the present time. It is admitted by all parties that the bonds are very well secured. The plan undertakes to give to the First Mortgage Birmingham Bonds an equal amount of new bonds secured by a first mortgage on the same Birmingham division bearing 4% and for the income bonds a second mortgage is given bearing 4% interest also.

Since admittedly these bonds are well secured and are long past due, it seems to the court that equity and good conscience requires that the holders of those bonds should receive either cash or a bond which is practically the equivalent of cash, or a bond which could be sold upon the market for par. The court believes that that is what the Commission intended to give to the holders of these bonds, but there seems to be some doubt about it in the minds of the various interested parties, and since the plan is to be referred to the Commission, it is suggested that the matter be disposed of by the Commission upon rehearing in accordance with the ideas herein stated.

136

The Consolidated Bondholders' Committee and the Chase National Bank, Trustee for the Consolidated Bondholders, object to the allowance by the Commission in the plan of 100 shares of preferred stock to the Spencers, who own a similar amount of preferred stock in the Kansas, Fort Scott & Memphis Railroad Company. The Spencers strenuously object to the treatment given them by the Commission and claim the amount of $10,000 in cash and interest.

In 1928, the debtor owned all of the outstanding common and preferred stock of the Kansas City, Fort Scott & Memphis 'Company, except 100 shares owned by the predecessor in title of the Spencers. At that time, the Board of Directors of the Fort Scott Company and its stockholders agreed to sell all of the assets of the Fort Scott Company to the debtor for the sum of $62,547,775. In order to pay for these assets, the debtor assumed the payment of the bonds of the Fort Scott Company amounting to $45,895,075. That left a balance of $16,649,700 unpaid on the purchase price (for the outstanding stock, both common and preferred of the Fort Scott Company, all of which, as stated above, except 100 shares, was owned by the debtor).

The debtor never did pay the Fort Scott Company this remaining balance, and if it had, it is assumed that the Fort Scott Company would have paid all of it back to the debtor company in liquidation of the stock which it held.

There is evidence to the effect that on October 24, 1928, the debtor and the Fort Scott Company made a tender to Messrs. Hartshorne and Battelle, the registered owner of the 100 shares of preferred stock now owned by the Spencers in the sum of $12,500, or $125 per share, and that this offer remained outstanding until the debtor went into receivership in 1932.

■ No claim was made by the holders of this 100 shares of stock until long after the debtor had gone into receivership and then into bankruptcy, and even until after the Commission had put forth a tentative Plan of Reorganization in 1939. Then for the first time, it seems the Spencers put in their claim for recognition in the reorganization. If the purchase price had been paid by the debtor and distribution thereof made to its stockholders, common and preferred in liquidation, the holder of this 100 shares of stock would have received $5,258. The purchase price was not so paid and distributed. This matter is not a very large matter in a reorganization of this magnitude, but since the Consolidated Bondholders' Committee and the trustee in the mortgage for the Consolidated Bonds object to the treatment accorded to the owners of this stock, and since the owners of the stock also object to the treatment given them, it seems to the court that the proper thing for the owners of this stock to do is to ask leave to institute a proceeding in this court for the purpose of establishing their rights. In such a proceeding the debtor or its trustee or the Fort Scott Company could set forth any equitable defense to this claim which they might have, such as the statute of limitations, laches, etc. Inasmuch as the matter is contested, it does not seem to this court that it can properly be disposed of as the Commission has attempted to dispose of it.

All of the other objections to the plan as herein above set out have been considered by the court and the court believes they are not well founded.

In conclusion the court wants to make itself very clear at this time in one particular. The court, the press and the public are very familiar with the past history of this railroad property. In this particular case the court considers that it is charged with the very grave responsibility of seeing to it that when the new company is launched, it shall be such a company as will have the confidence of the community and the entire public. This court, therefore, expects to see to it that the first Board of Directors of the new company, as well as its officers from top to bottom, are composed of men of unquestioned standing, character and integrity, as well as ability. If the company is started off with such directors and such officers, the court believes that the owners of the property will see to it that such men are maintained in charge of its affairs and this reorganization will not have been a failure. It is suggested in this connection that the new plan to be forthcoming from the Commission should so set forth the machinery with reference to the reorganization managers, the naming of the first Board of Directors and, if necessary, provide for a voting trust, in order that this court may easily see that the objects and results herein suggested shall be attained.

It is, therefore, ordered that the plan submitted by the Interstate Commerce Commission referred to herein, together with the record and all the papers forwarded by the Commission to this court with the plan, be returned to the Interstate Commerce Commission to be reconsidered.

## St. Louis-San Francisco Railway Company Reorganization—F.D. No. 10,00?
### Distribution of new securities—Approved Plan
The percentages shown are percents of total claim

| Outstanding issue | Principal Amount | Principal plus interest to 1/1/40 | Undisturbed | First divisional mtg. 30-year 4's | Second divisional mtg. 30-year 4's | First and gen. mtg. 50-year 4's | Second mtg. income 75-year 4½'s | Five percent Preferred stock | Common stock no-par shares | Totals, common stock stated at $50 a share | Fixed int. | Contingent int. | Pref. stock | Common stock | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Equipment obligations | $5,874,000 | $5,874,000 | 100% $5,874,000 | | | | | | | 100% $5,874,000 | | | | | |
| Birmingham gen. 4's | 3,323,390 | 3,323,390 | | 100% $3,323,390 | | | | | | 100% 3,323,390 | 1,000 | | | | 1,000 |
| Birmingham inc. 5's | 3,182,780 | 3,182,780 | | | 100% $3,182,780 | | | | | 100% 3,182,780 | 1,000 | | | | 1,000 |
| Fort Scott 4's | 25,835,000 | 32,293,750 | | | | 49.1% $15,854,394 | 30.6% $9,881,847 | 20.3% $6,557,509 | | 100% 32,293,750 | 614 | 382 | 254 | | 1,250 |
| Prior lien 4's | 91,887,097 | 118,651,973 | | | | 11.3% 13,383,406 | 9.1% 10,768,838 | 18.7% 22,150,630 | 25.4% 601,972.52 | 64.4% 76,401,500 | 146 | 117 | 241 | 327 | 831 |
| Prior lien 5's | 25,561,500 | 34,868,441 | | | | 11.3% 3,933,003 | 9.1% 3,164,655 | 18.7% 6,509,440 | 25.4% 176,502.61 | 64.4% 22,452,2?3 | 154 | 124 | 255 | 346 | 879 |
| Consolidated 4½'s | 108,305,000 | 142,803,792 | | | | 12.9% 18,329,302 | 9.2% 13,172,511 | 14.8% 21,149,648 | 12.8% 367,231.87 | 49.7% 71,013,0?4 | 169 | 122 | 195 | 170 | 656 |
| Consolidated 6's | 10,000,000 | 14,397,700 | | | | 12.9% 1,847,923 | 9.2% 1,328,027 | 14.8% 2,132,266 | 12.8% 37,023.59 | 49.7% 7,159,395 | 185 | 133 | 213 | 185 | 716 |
| R.F.C. priority claim | 3,390,000 | 3,390,000 | | | | 100% 3,390,000 | | | | 100% 3,390,000 | | | | | |
| R.F.C. collaterally secured | 1,800,000 | 3,969,533 | | | | 34.1% 1,352,263 | 24.6% 974,916 | 39.7% 1,578,411 | 35.2% 27,992.38 | 133.6% 5,305,209 | | | | | |
| R.C.C. | 3,307,432 | 3,691,060 | | | | 100% 3,691,060 | | | | 100% 3,691,060 | | | | | |
| Banks | 5,136,863 | 7,276,503 | | | | 20.9% 1,523,793 | 15.0% 1,095,091 | 24.2% 1,758,265 | 21.0% 30,529.65 | 81.1% 5,903,637 | | | | | |
| Fort Scott pref. stock | 10,000 | 10,000 | | | | | | 100% 10,000 | | 100% 10,000 | | | | | |
| Frisco pref. stock | 49,158,300 | 49,158,300 | (eliminated) | | | | | | | | | | | | |
| Frisco common stock | 65,543,226 | 65,543,226 | (eliminated) | | | | | | | | | | | | |
| General creditors (est.) | 250,000 | 250,000 | (eliminated) | | | | | | | | | | | | |
| **Totals** | 402,564,588 | 488,689,448 | 5,874,000 | 3,323,390 | 3,182,780 | 63,305,149 | 40,385,885 | 61,846,169 | 1,241,652.62 | 240,000,004 | | | | | 49.1% |
| **Charges** | | | 207,664 | 132,936 | 127,311 | 2,532,206 | 1,817,365 | 3,092,309 | | | | | | | |